ASSINIBOIA CORPORATION, a corpora-
tion of the State of Delaware,
et al., Plaintiffs,

v.

Arthur Henry CHESTER, one of the Under-
writers at Lloyd's, et al., Defendants,

John W. Burgess, Trustee for mortgagee,
Intervenor.

Superior Court of Delaware,
New Castle.

June 7, 1974.

Ernest S. Wilson, Jr., Wilson & Russell, Wilmington, for plaintiffs.

Edmund N. Carpenter, II, Richards, Layton & Finger, Wilmington, for defendants Arthur Henry Chester and Edinburgh Assurance Co., Ltd.

Richard H. May, Young, Conaway, Stargatt & Taylor, Wilmington, and James E. O'Halloran, Jr., Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendant Fred S. James & Co., Inc.

Richard I. G. Jones, and Robert Ralston, Prickett, Ward, Burt & Sanders, Wilmington, for intervenor.

## OPINION

CHRISTIE, Judge.

The S. S. Assiniboia was a passenger and cargo ship which was built in Glasgow, Scotland in 1907–1908. For many decades the ship was operated on the Great Lakes by the Canadian Pacific Railroad Company.

After the ship was taken out of service, it was sold by Canadian Pacific Railroad in 1968 to J. A. L. Steamship Line, Ltd., for $30,100. The purchaser anticipated that the ship could be resold for substantially more than its purchase price and advertised it for sale.

A Peter Vanes, acting for himself and for other investors, entered into negotiations to purchase the ship with a view to converting it into a restaurant.

Vanes agreed to pay $25,000 to move the ship to Philadelphia and an additional $55,000 at settlement after the ship had docked. In addition, the Vanes group was to take title to the ship subject to a $120,000 mortgage which the Vanes group was to pay off by November 15, 1969, with interest. Vanes himself was apparently regarded as being entitled to a commission of $19,500 for his work and this was his investment in the project.

Vanes had essentially no capital and lived on a very modest scale in a rented room with no telephone. All of the funds required were supplied or were to be supplied by his business associates.

Under the terms of the mortgage, the Vanes group was required to obtain insurance on the ship in the amount of $300,000. To accomplish this, Vanes contacted Criddle Associates, Inc. at that time, Vanes represented that the ship was being purchased for about $220,000 with a down payment of $50,000. Through a complex series of brokerage communications, insurance known as port risk insurance was obtained in the amount of $300,000. In addition, insurance known as protection and indemnity coverage was obtained. The insurers were a group of underwriters at Lloyd's in London.

The chain of brokers was as follows: Vanes contacted a Robert L. Beling, of Criddle Associates, Inc., to obtain insur-

ance on the Assiniboia. The Criddle firm in turn contacted Fred S. James & Co., Inc. (with which Criddle merged in January, 1969). These firms in turn dealt with Despard & Co. in New York (and this firm has also merged with Fred S. James). Despard in turn dealt with Leslie and Godwin in London, and Leslie and Godwin went to Lloyd's and placed the insurance with the Underwriters. Under the applicable law in both the United States and England, the various brokers are all considered agents of the insured.

The ship was successfully brought from Canada to a dock at Camden, New Jersey. The Vanes group formed a corporation known as Assiniboia Corporation. Detailed planning for converting the ship into a restaurant would have been the next step in the project; but for some reason, it never took place.

At this point, the project bogged down. There was an obvious lack of capital which seemed to stem from a withdrawal of some of the backers. The ship lay at the pier in Camden without any substantial work being done to convert it into a restaurant from the time it was brought to Camden in September, 1968, until it was destroyed by fire on the night of November 8, 1969. Meantime, the insurance policies had been renewed by the Underwriters at three-month intervals and were still in effect at the time of the fire.

For some time before the fire, it had been apparent that the project was in financial trouble. The insurance premiums, by then amounting to more than $8,900, had never been paid and in early November, 1969, the owners had been informed that the insurance was about to be cancelled. The $120,000 mortgage was due on November 15, 1969. The principal financial backers of the project appeared to have lost interest and there was no apparent alternate source of funds.

Vanes had undertaken to sell the ship, but at the same time was talking as though he was lining up a more ambitious ship purchase.

After the fire, the Vanes group sought to collect under the terms of the insurance policies from the Underwriters. The Underwriters disputed their right to recover and this suit followed.

It is the contention of the Underwriters that the loss was occasioned by arson on the part of Assiniboia Corporation or at its connivance. The Underwriters also contend that the policies are void or may be avoided because of alleged material misrepresentations and concealments of fact said to have been made on behalf of all the owners by Vanes and by Vanes' agents when they obtained the coverage and the extentions of coverage.

John W. Burgess, trustee for the mortgage holders was allowed to intervene on behalf of the mortgagees and the positions taken by him on behalf of the mortgage holders are similar to those taken by plaintiffs.

Plaintiffs have sued "Arthur Henry Chester, one of the Underwriters at Lloyd's and Edinburgh Assurance Company, Ltd., as representative defendants with the agreement of all subscribing insurers" and this group of insurers is referred to as the Underwriters. In addition, plaintiffs have sued Fred S. James & Co., Inc., their insurance broker, alleging in effect that if misrepresentations were made in obtaining the insurance from the Underwriters and if the coverage is avoided on account of such misrepresentations, James is the one at fault and so is liable to plaintiffs.

## ALLEGED ARSON

The contention that plaintiffs are guilty of arson is based on the troubled financial situation of the Vanes group at the time of the fire and the circumstances surrounding the fire itself. After a review of the evidence, I conclude that there is no direct evidence that the fire was caused by arson and the circumstantial evidence falls short of showing that the cause of the fire was arson. I also find that there is no creditable evidence that the arsonist, if there was

an arsonist, was procured by any of the plaintiffs or at their connivance.

There has been much argument in this case as to whether, assuming arson is an issue, the Underwriters or the assured have the burden of proving that the loss was an insured loss—that is, that the loss was caused by a fire which in turn was a result of something other than arson on the part of plaintiffs.

■ I find it unnecessary to resolve the burden of proof issue because plaintiff has clearly established that the loss was by fire of unknown origin and I find that defendant's evidence falls short of putting the arson issue before the Court. If I had found that arson had taken place, then the Court would be required to decide which party has the burden of proof as to the source of the arson. But here in the absence of proof of arson, the defense has failed to reach the point where burden of proof must be resolved.

■ Shortly after midnight on the morning of November 9, 1969, an officer of the West Deptford Police Department drove into the Sanitarium Playground where the ship was moored and checked the ship. All appeared to be normal. About an hour later, the same officer made another patrol and observed smoke of a light gray color coming from the ship. The officer immediately called his dispatcher on the police radio and within 12 minutes, fire trucks were on the scene pumping water on the fire.

The officer awoke the watchman who lived nearby and they went to the ship. They did not detect any smell of gasoline, coal oil or other petroleum product and, at that time, the ship was burning in only one place. The fire was some distance from a small heater which had been installed on the ship.

The firemen were ordered not to go on the ship because of the supposed danger of explosion. In fact, for the same reason, the firemen were pulled back off the pier. Their efforts to fight the fire from a distance were ineffective. After 30 minutes, the fire, which eventually burned for many hours, had begun to spread to other parts of the ship; but the small amount of fuel oil which was on the ship for the operation of a small heater never ignited and was still there after the fire.

Weeks earlier there had been some trespassing on the ship during the time it lay at the pier and some juveniles had been reported to the juvenile authorities in connection with the alleged trespassing. However, there had been an attempt to prevent this by placing a padlock on the steel door which gave the only practical land access to the ship. After the fire had started and the firemen were on the scene, the padlock was found and it was apparent that it had been cut with a strong tool such as bolt cutters.

I am of the opinion that the evidence presented falls short of indicating that the fire was caused by an arsonist and the Court will not regard arson as a factor in this case in the absence of some indication that it was the cause of the fire.

The possibilities are numerous. The padlock might have been cut hours before the fire by any number of people and for any number of reasons. Or it might have been cut by one of the many of firemen who were apparently on the scene before the condition of the lock was observed. The fire might have been caused by an angry juvenile or by the carelessness of an intruder who had left the ship by land or by boat long before the fire was large enough to be observed from shore.

There is reason to believe that a fire of this type would not be the work of a professional arsonist. The fire was not fed by petroleum products and it appeared to get off to such a slow start that it might well have been brought under control but for the great caution of the fire fighters. It is probable that an arsonist with a

$300,000 job on his hands would have arranged a mighty conflagration lest he fail in his mission.

■ If there had been evidence to place the issue of arson before the Court, there is no direct evidence of any sort which places plaintiffs or any of their agents or associates in the vicinity of the ship during the hours before the fire. One does not become an arsonist upon proof that his property burned at a time when his financial situation and other surrounding circumstances made it to his advantage to have his property burn at that very time.

If the arson issue were in the case, I would resolve the matter in favor of plaintiffs even if the burden of proof were deemed to be upon plaintiffs.

## MISREPRESENTATIONS AND BAD FAITH

The alleged material misrepresentations or concealments in obtaining the insurance pose more difficult questions.

■ It is the position of the Underwriters that the long chain of insurance brokers which stretched from the ship owners to the Underwriters at Lloyd's in London were all agents of the ship owners and that everything these agents did or failed to do was, as far as the Underwriters are concerned, acts of the ship owners. I find this to be a correct statement of the law. *Connecticut Fire Insurance Co. v. Davison Chemical Corporation,* 54 F.Supp. 2 (D. Md.1944); *Anglo-African Merchants, Ltd. and Exmouth Clothing Co., Ltd. v. Bayley,* 21 Ll.L.Rep. 268, 277, Q.B. (1969).

A representative from Lloyd's testified in effect that in the placement of marine insurance, the utmost good faith of those involved is so essential that it becomes an implied condition of every contract. He then testified at length that if certain facts which were known to the ship owners and which he thought should have been made known to the Underwriters, had been known to the Underwriters when the initial application for insurance was made, the Underwriters would not have underwritten the insurance contracts. He attempted to also establish that a similar situation pertained at each renewal of the policies. Later, however, the same witness testified that many of these factors were not important to the Underwriters and he was not really sure what information his group had been given by the time of the final renewal of the policies.

The witness for the Underwriters gave much interesting miscellaneous testimony. The physical aspects of a ship to be insured are the main factual concerns of a marine insurance underwriter. In this case, there were no material misrepresentations in that area.

Underwriters are also concerned about keeping the fire fighting equipment in good working order on any ship, but such equipment played no part in this loss. In the financial area, an underwriter is mainly concerned about getting his premiums; but in this case, although the premiums had not been paid, they had in effect been advanced by the owners' brokers. The underwriter does not get much involved in the general financial stability of the assured.

■ When it came to specific alleged misrepresentations and concealments, the Underwriters failed to establish their defense.

Some of the principle allegations may be summarized as follows:

1) It is contended that Vanes misrepresented the identity of the owners of the ship. There is evidence that Vanes allowed his agents to think he was a man of some means when in fact he was of very modest means indeed and his funds came from others. He is alleged to have arranged to have the insurance in his own name before the plaintiff corporation was organized and to have been told that his principle financial backers "don't have a good name." However, there is no evi-

dence that the names of the backers were withheld and, in any event, the insurance contracts were in the name of the plaintiff corporation long before the final renewal. As of the date of the last renewal of the insurance, no material misrepresentations were in effect as to the identity of the plaintiff corporation and the identity of the backers was no longer important since they had no known legal obligations to the corporation and they were obviously unable or unwilling to carry through the project.

2) It is contended that the financial status of the assureds or those represented to be the owners of the Assiniboia was continuously misrepresented or concealed. Here again, there is a lack of proof that material misrepresentations were actually made to the Underwriters and, what is more important, the Underwriters admit that they had assumed the project was in financial trouble when they renewed the policy for the last time. There is lack of proof that the Underwriters were misled in a material way by this situation.

3) The Underwriters contend that information was distorted or withheld as to the value of the vessel. The value of the vessel was stipulated in the policy. The record fails to show any materiality as to the alleged lack of information as to value. The Underwriters' principle witness indicated that if the true facts as to what plaintiffs had paid for the ship had been known to the Underwriters, the Underwriters would not have regarded the ship as overinsured.

■ The earlier sale of the ship by Canadian Pacific at a fraction of the price paid by plaintiffs might have caused the Underwriters to be concerned, but the Underwriters must concede that the details of an earlier sale were not matters about which plaintiffs were required to know or to tell the Underwriters.

4) It is contended that the assureds failed to reveal the lack of security provision as to the vessel. It appears that young people had entered the ship on one or more occasions prior to the fire and that the incidents had been reported to the juvenile authorities in New Jersey. This had not been reported to the Underwriters and if it had been, the Underwriters would have tried to make arrangements to require a resident guard rather than a guard living a few hundred feet from the ship. However, the Underwriters recognized that there was a risk of trespassing and they were generally satisfied with the security arrangements.

Other alleged misrepresentations or concealments were considered and the conflicting contentions in regard thereto were resolved in favor of plaintiffs.

The contentions forming a part of the Underwriters' position were very difficult for the Underwriters to maintain during the presentation of evidence because:

1) As to many items there was no clear showing as to what alleged misrepresentations or lack of representations were actually operative at the time the final three-month renewal of the insurance contracts was agreed upon. By the final renewal, the witness himself knew most of the facts which were pertinent and material, but the witness had had little or nothing to do with that renewal and there are many others at Lloyd's who might have had even more complete information by that time. Lloyd's seems to pride itself on its lack of insurance application forms and of records.

2) Since all insurance brokers involved, even Leslie and Godwin, one of the chosen brokers who are permitted by Lloyd's to appear there, are regarded as being agents of the ship owners, the ignorance of those at Lloyd's as to certain facets of the matter must be laid in part to Lloyd's apparent failure to inquire rather than to any failures on the part of the ship owners chain of agents. The Underwriters may have chosen to rely on the utmost good faith of the ship owners chain of agents, some of whom

were known to Lloyd's and strangers to the ship owners. But, in the absence of clear rules, questionnaires, application forms or even oral inquiries of significance, it is not surprising that the owners' agents seeking to place the insurance were not as critical of their clients' alleged shortcomings as the Underwriters became after the fire.

■ The law in both the United States and Great Britain is that a failure by insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option. *Stipcich v. Metropolitan Life Insurance Company*, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928). But, in this case, it has not been shown that plaintiffs were in violation of their duties as to disclosure at the time of the final renewal.

In reviewing plaintiff's position as to the alleged material misrepresentations, I find they fall into one or more of the following categories:

1) Some are not misrepresentations at all but rather a form of ignorance under which the Underwriters chose to operate since the materiality of the facts in question is at best marginal and there is no evidence that the Underwriters made any pertinent inquiry.

2) Some are not "material" in a legal sense and were not even regarded as significant by the representative of the Underwriters.

3) Some, if they could have been found to be material misrepresentations when the policies were originally entered into, were no longer such by the time the final renewal was agreed upon because the misimpressions had been corrected or were no longer pertinent.

■ The principle witness for the Underwriters was an expert on the meaning of insurance terms as they apply to marine insurance. He pictured the "utmost good faith" in insurance matters as requiring that those seeking marine insurance are in fact seeking coverage of a "well intended

risk." He also explained that a "well intended risk" means two things—first, that the assured has the intention to do what he says that he is going to do and; secondly, that he has the financial ability to carry out that intention.

This analysis came from an interested witness, but upon reflection, I find it may well state what would constitute good faith between the contracting parties when they first contracted.

■ However, in this case, the intention of the plaintiffs to carry out the project was established and their financial ability to do so was not unlike that of new corporate enterprises in general. At the time, they thought they could finance it and it has not been shown they could not have done so. Plaintiffs' weaknesses both as to altered intentions and inability to complete the project, which developed later, were or should have been apparent to the Underwriters by the time of the last renewal.

It is clear that the Underwriters had known two important facts for some time: 1) the premiums paid to the Underwriters had been advanced by the brokers and had not yet been paid by the owners and; 2) it was apparent that the floating restaurant project was stalled and was likely to remain stalled for lack of funds. The Underwriters might have tried to take the position that the policies were void. Instead, they only notified plaintiffs that the policies would not be renewed.

The collapse of the project before the fire does not in itself establish that "bad faith" or a lack of a "well intended risk" existed at the time the policies were renewed. Projects conceived and insured in good faith are not immune from collapse and, by the time of the last renewal, the Underwriters appear to have known the material facts.

A general finding in favor of plaintiffs will be entered. IT IS SO ORDERED. The Court will confer with the attorneys as to details of the final order.