John T. OGLESBY, II, M.D., Plaintiff,

v.

The PENN MUTUAL LIFE INSURANCE COMPANY, Defendant.

Civ. A. No. 93–224 MMS.

United States District Court,
D. Delaware.

Dec. 23, 1994.

Opinion Denying Reargument
Feb. 16, 1995.

Anne C. Naczi, Tybout, Redfearn & Pell, Wilmington, DE, for plaintiff.

William W. Erhart, Erhart & Laffey, Wilmington, DE (Douglas F. Johnson, Earp, Cohn, Leone & Pendery, Westmont, NJ, of counsel), for defendant.

### *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## INTRODUCTION

Plaintiff John T. Oglesby, II filed suit against defendant The Penn Mutual Life Insurance Company ("Penn Mutual") in Delaware state court. Oglesby alleged breach of contract for failure to pay benefits under a disability insurance policy and breach of the duty of good faith and fair dealing. Specifically, he averred that from August 1990 to the present, he has been totally disabled within the meaning of the policy, and that Penn Mutual wrongfully denied him benefits thereunder. Oglesby is a citizen of Delaware.

Pursuant to 28 U.S.C. § 1441, defendant, a Pennsylvania corporation, removed plaintiff's lawsuit to federal court, invoking federal diversity jurisdiction under 28 U.S.C. § 1332. Penn Mutual also filed counterclaims seeking declaratory relief, alleging it is not obligated on the policy and seeking to void or rescind certain components of the policy.

Before the Court is defendant Penn Mutual's motion for full or partial summary judgment, based on four different grounds. Penn Mutual contends it is entitled to full summary judgment because: (1) Oglesby is not totally disabled from his regular occupation within the meaning of the policy; and (2) Oglesby failed to timely comply with the notice and proof of loss provisions required by both the policy and 18 Del.C. § 3311. In the alternative, Penn Mutual seeks partial summary judgment, arguing that, even if Oglesby is disabled under the policy, (3) he is not entitled to the benefit increases from the 1989–1992 policy amendment riders because the riders are subject to rescission under

equitable fraud principles, and (4) he is barred from collecting increased benefits from the 1991–1992 policy amendment riders because he was already disabled when the riders became effective.

The Court heard oral argument in this matter on October 19, 1994. Upon consideration of the parties' arguments, both written and oral, for the reasons that follow, the Court will deny full summary judgment and grant Penn Mutual's motion for partial summary judgment as to the rescission of the 1989–1992 benefit riders. Under these dispositions, defendant's fourth ground for summary judgment is rendered moot.

**FACTUAL BACKGROUND**

Plaintiff Oglesby, a physician, applied to Penn Mutual for disability insurance in November 1986 through his longtime friend and Penn Mutual insurance agent, William Lee. Docket Item ("D.I.") 61 at 57–58. At the time, Oglesby was 47 years old. D.I. 61 at 52. Plaintiff was then and remains a Board certified radiologist at the Medical Center of Delaware in Newark, Delaware; he is also a partner in a group practice of 19 radiologists. *Id.* at 96. When he applied for disability insurance he was the hospital's Chief of Vascular and Interventional Radiology, a medical sub-specialty within the radiology discipline. *Id.* at 52.

Though most laymen may be familiar with the responsibilities of a general radiologist, e.g., interpretation of x-ray and other radiological film studies, the duties of an interventional and vascular radiologist are not as self-evident. The field of interventional and vascular radiology has rapidly expanded over the past decade into a discipline which overlaps many other medical specialties, such as surgery, cardiology, and gastroenterology. *Id.* A physician practicing interventional and vascular radiology may perform procedures as diverse as balloon angioplasty (opening clogged blood vessels), drainage of abscesses, placement of filters in the blood system supplying the lungs to prevent emboli (blood clots), and gastrostomy (feeding tube) placement. D.I. 61 at 281–82. Plaintiff claims that 80% to 100% of his duties and time were taken up by these responsibilities

prior to the onset of his disability. *Id.* at 283; D.I. 63 at 23, 26, & 29.

At the heart of this action is whether plaintiff is now disabled from practicing such medical procedures. A recap of plaintiff's medical history, a chronology of assorted ailments, is therefore in order. During the 1970s, Oglesby experienced intermittent lower back aches, relieved by aspirin or rest. D.I. 61 at 224. In 1981, he suffered an onset of "severe bolt-like" pain in his neck, which also radiated down his left arm. *Id.* at 225–227. Consultation with a neurologist revealed a neck condition, cervical radiculopathy (nerve root irritation); this was diagnosed as resulting from cervical spine arthritis. *Id.* at 225. Oglesby's symptoms abated after treatment with the drug Motrin; his illness lasted approximately two months. *Id.* at 116, 225–227. Plaintiff did not seek treatment for any recurrence of neck symptoms as of November 1986, the time he applied for the Penn Mutual policy. *Id.* at 217. In 1985, plaintiff underwent a total hip replacement due to a long history of arthritis in the hip joint. *Id.* at 51.

Plaintiff submitted his application for Penn Mutual disability insurance on November 24, 1986. *Id.* at 52. The application's question number 12 asked that he describe his "Occupation and Exact Daily Duties." *Id.* at 51. Plaintiff answered by declaring he was a "Physician—Radiologist—Diagnostic Radiology and Director of Interventional and Cardiovascular Radiology." *Id.* The Penn Mutual application also included questions about plaintiff's medical history. Question 20(a) asked, within the past five years, had plaintiff "consulted a physician; been advised to have medical treatment or surgery; been hospitalized; requested, received or been refused insurance benefits for any injury or sickness?" *Id.* Plaintiff answered affirmatively, stating yes, he had undergone a total hip replacement in 1985 due to degenerative arthritis. *Id.*

Question 20(c) asked whether plaintiff "ever had any known indication of or been treated for: ... disease or disorders of the ... bones including spine, back, or joints?" Oglesby answered this by cross-referencing to the answer in 20(a). *Id.* Question 20(c),

however, was not limited to "within the past five years." Oglesby did not disclose his previous cervical spine (neck) problem. Oglesby signed the bottom of the application, certifying that all statements contained therein were true, complete, and correctly recorded. *Id.* at 52.

On November 3, 1986, a medical examiner for Penn Mutual[1] performed a history and physical on plaintiff. She interviewed him pursuant to questions on a Penn Mutual Medical Examiner Report Form. *Id.* at 53. On the Report Form, question 2(h) asked, "Have you even been treated for or had any indication of arthritis, gout, or disorder of muscles, bones or joints?". *Id.* Oglesby answered this in the affirmative, elaborating with details of his total hip replacement. *Id.*

The medical examiner also documented plaintiff as having a history of "degenerative changes in the *lumbar* spine—no symptoms" (emphasis added). *Id.* The lumbar spine, contrasted with the cervical or neck spine, is located in the lower back near the waist area. *Dorland's Illustrated Medical Dictionary* 759 (26th ed. 1981). The import of this notation is unclear, however, as it was correlated to a nonexistent question number, 4(g). *Id.* As on the policy application, Oglesby certified as to the truth, accuracy, and completeness of the medical examiner's document. *Id.*

Penn Mutual issued plaintiff his disability insurance policy February 24, 1987, retroactively effective to February 1, 1987. D.I. 1 at ¶ 3; D.I. 4 at ¶ 3. The policy contained a two year incontestability clause which prohibited the insurer from challenging both misstatements by Oglesby on the policy application and pre-existing sicknesses or conditions for claims submitted more than two years after the policy's effective date. D.I. 61 at 49 § 8. The two year limitation on contestability for pre-existing conditions did not apply to any condition explicitly excluded from coverage by name or specific description. *Id.*

Oglesby's disability policy contained such an exclusion. In a "Policy Amendment Rider—Specified Condition Not Covered," the defendant provided language that it would "not cover disability or other loss which results in whole or in part" from "any impairment due to degenerative arthritis or rheumatism." *Id.* at 173. Oglesby negotiated with the company to narrow this language, which resulted in a policy exclusion for only "any impairment due to degenerative arthritis or rheumatism *of the hip region.*" (emphasis added) *Id.* at 141. Peter Sokop, the underwriter for plaintiff's disability policy, testified during the discovery phase of this litigation that had plaintiff informed the insurer of his 1981 diagnosis of cervical spine arthritis, Penn Mutual would have insisted on, at a minimum, the original rider language, excluding coverage for disability relating to *any* degenerative arthritic condition. *Id.* at 263, 266–67.

The Penn Mutual disability policy also afforded Oglesby an annual option to apply for successive five percent increases in his total disability benefits, effective on February 1 of each year, for an increased premium. *Id.* at 38. Plaintiff availed himself of this option annually. Other significant policy provisions delineated notice and proof of loss requirements, procedures for filing a claim for benefits, waiver of premiums in the event of total disability, and incorporation of the application and any attached riders into the entire insurance contract. *Id.* at 36–38. In the event of plaintiff's disability from his "regular occupation," the policy would pay Oglesby a monthly benefit of $5,000.

Soon after receiving his new disability insurance policy, Dr. Oglesby sought clarification from Penn Mutual on how the policy defined his "regular occupation." On April 2, 1987, Penn Mutual responded by letter, stating that it understood plaintiff to be a radiologist. D.I. 63 at 63. Plaintiff then advised Penn Mutual that his regular occupation was in the radiology sub-specialty of interventional vascular radiology and requested classification accordingly. On May 5, 1987, Penn

---

1. Defendant characterizes this physical as a "paramedical exam"; the exam was not performed by a physician. Defendant's Opening Brief, D.I. 60 at 7. The Court notes that the record date for plaintiff's medical exam predates the one ascribed on the written application for the disability policy. This apparent incongruity does not impact the issues at summary judgment.

Mutual gave Oglesby written confirmation that it considered his present occupation to be "as an interventional and vascular radiologist." *Id.* at 31.

When Dr. Oglesby performed his interventional and vascular radiology procedures, he was required to wear a heavy lead apron which hung from around his neck. D.I. 61 at 241–243. Sometimes, in the course of attending to a patient and while wearing his lead apron, he was forced to crane his neck awkwardly so that he could see both his patient and the readout screen on the radiological monitoring equipment. D.I. 61 at 243.

In approximately March 1990, Oglesby experienced pain in his left neck and shoulder radiating down his arm. D.I. 61 at 218. He consulted the same neurologist who had treated him in 1981, Dr. Alan Fink, who reiterated the previous diagnosis of degenerative arthritis in the cervical spine region. *Id.* at 220–21, 285. X-rays of plaintiff's neck showed that plaintiff's condition had worsened since 1981. *Id.* at 220. Oglesby realized that wearing the requisite lead apron during interventional and vascular procedures aggravated his neck, shoulder, and arm symptoms. D.I. 63 at 11. Because of his neck problem, Oglesby did not perform any hands-on vascular or interventional radiology procedures from April 1990 to June of 1990. *Id.* at 285. He was, however, able to read routine radiology films and function as a general radiologist. *Id.* at 155.

Oglesby felt able to resume performing interventional and vascular radiology procedures during June or July 1990. *Id.* at 285. In August 1990, he suffered another relapse of neck, shoulder, and arm pain. *Id.* at 157. He once again refrained from any interventional vascular procedures. *Id.* at 158, 285. Dr. Fink treated him with steroids and physical therapy until October 1990; plaintiff obtained no relief from this therapeutic course. *Id.* at 157. Oglesby then consulted a neurosurgeon, Dr. Frederick Simeone, who diagnosed two abnormally bulging disks in plaintiff's cervical spine. *Id.* at 158–59.

In October 1990, neurosurgeon Simeone performed a surgical laminectomy and foraminotomy procedure to repair the bulging bony disks which were impinging on the nerve roots in Oglesby's cervical spine. *Id.* at 236–37; D.I. 63 at 11. Post-operatively, Oglesby experienced profound muscle weakness in his neck, back, left shoulder, and left arm. D.I. 61 at 167, 238, 285. He managed to return to work in November 1990 on a part-time basis, but he limited his work duties to the reading of x-ray films. *Id.* at 185.

Initially after the surgery, Dr. Simeone was confident that Oglesby would enjoy a full recovery. D.I. 63 at 10. By January 1991, Oglesby was able to work full-time as a general radiologist (with time off for physical therapy sessions). D.I. 61 at 285. However, he suffered another flare-up of left arm pain in June 1991. *Id.* at 166–67. As a result, he decreased the aggressiveness of his rehabilitative therapy. *Id.* at 168.

By November 1991, it had been over a year since Oglesby performed any interventional and vascular radiology procedures. *Id.* at 285. Dr. Simeone, however, remained enthusiastic regarding plaintiff's complete recovery of muscle strength in the affected area. *Id.* Nevertheless, because of his prolonged recovery, plaintiff was concerned whether he should notify Penn Mutual of his condition. *Id.* at 5–6. He wondered about his eligibility for the upcoming insurance benefit increase rider in February; if he was deemed disabled before the rider's effective date, he would not qualify for the increase. *Id.* at 6.

Oglesby telephoned his friend and insurance agent Bill Lee, who by this time was no longer affiliated with Penn Mutual. *Id.* at 5. They discussed whether it was proper to notify Penn Mutual of his disability, in light of the neurosurgeon's assurances of complete recovery. *Id.* Because Lee no longer represented Penn Mutual, he referred plaintiff to Robert Altemus as a successor Penn Mutual agent. *Id.* The three of them—plaintiff, Lee, and Altemus—spoke together in a conference telephone call in November 1991. *Id.* Lee and Altemus agreed that plaintiff need not give notice of disability to Penn Mutual because plaintiff's physician was still predicting a full recovery. *Id.* at 6. They also recommended that plaintiff apply for the

February 1992 benefit increase. *Id.* Plaintiff followed their advice.

Oglesby's symptoms persisted, and in June 1992 his neurologist, Dr. Fink, informed him that his condition would be permanent. D.I. 61 at 285. Plaintiff's neurologist and neurosurgeon both concurred that Oglesby could no longer perform interventional and vascular radiology procedures. *Id.* at 222(a), 246. Plaintiff gave notification of his disability to Penn Mutual on June 12, 1992. *Id.* at 233. Penn Mutual then dispatched the proper claim forms for plaintiff to complete; plaintiff filed his written claim for benefits on June 22, 1992. *Id.*

Oglesby has resigned as the Director of Interventional and Vascular Radiology at the Medical Center of Delaware. He continues to work there full-time as a general radiologist, primarily reading x-ray films. Neither his salary[2] nor his partnership status in the radiology group has been adversely affected by any lost time from work.

Because Penn Mutual rejected plaintiff's claim for disability benefits, plaintiff filed this lawsuit on April 5, 1993.

## APPLICABLE LAW—Choice of Law

In this diversity action, the Court must first address the threshold issue of which law governs the rights and liabilities of the parties before it. In so doing, the Court looks to the substantive law of the forum state in which it sits, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); the forum state's choice of law doctrine is included within its substantive law. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994).

■■■ Under Delaware law, where contracting parties have agreed on what law governs, a court may forgo independent analysis and accept the parties' agreement. *Wilmington Trust Co. v. Wilmington Trust Co.,* 26 Del.Ch. 397, 24 A.2d 309, 313 (1942); *Rosenmiller v. Bordes,* 607 A.2d 465, 468 (Del. Ch.1991); *National Acceptance Co. of California v. Mark S. Hurm, M.D., P.A.,* CA

84L–JN–7, 1989 WL 70953 *1 (Del.Super.Ct. June 16, 1989). The Penn Mutual insurance policy looks to the state law where the insured resides, in this case, Delaware, as governing the legal standards underlying the policy's contractual provisions. D.I. 61 at 50. Accordingly, the substantive law of Delaware will supply the rule of decision.

## Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are those which, under applicable substantive law, might affect the outcome of the case. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

■■■ A party moving for summary judgment is not required to support its motion with evidence disproving or negating its opponent's claim. *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1000 (3d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). The moving party, however, does bear the initial burden of demonstrating the absence of material issues of fact, regardless of which party has the burden of persuasion. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (in banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Where, as in this case, the non-moving party will bear the burden of proof at trial, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Davis v. Portline Transportes Mari-*

---

2. Plaintiff's income actually increased. D.I. 61 at 279.

*time Internacional,* 16 F.3d 532, 536 n. 3 (3d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 325, 106 S.Ct. 2548, 2552, 2553–54, 91 L.Ed.2d 265 (1986)).

 When considering a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). In drawing these inferences, where the moving party's evidence contradicts the movant's, then the nonmovant's must be taken as true. *Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 512 (3d Cir.1994) (citation omitted). The Court may not weigh evidence or make credibility determinations. *Petruzzi's IGA Supermarkets v. Darling–Delaware,* 998 F.2d 1224, 1230 (3d Cir.), *cert. denied, Moyer Packing Co. v. Petruzzi's IGA Supermarkets,* — U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). If the record could not lead the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Mindful of these precepts, the Court turns to the operose task of addressing defendant's arguments seriatim.

## I. TOTAL DISABILITY

Penn Mutual first seeks full summary judgment on the ground that Oglesby's physical ailment is not a covered loss under the terms of the disability insurance policy. It maintains that because plaintiff is not disabled from performing his regular occupation, he is therefore not disabled within the definition of the policy.

 Disability insurance policies usually fall into two categories: general insurance, which provides coverage if the insured is unable to pursue any gainful occupation; and occupational insurance, which covers an insured when he is unable to pursue the particular occupation in which he was previously engaged. Mark S. Rhodes, 15 *Couch on Insurance* 2d § 53.45 (1983); E.L. Kellett, Annotation, *What Constitutes Total or Permanent Disability Within the Meaning of*

*Insurance Policy Issued to Physician or Dentist,* 21 A.L.R.3d 677, § 2b (1968). Defendant does not dispute that the insurance policy at issue falls into the latter category. With that said, however, Penn Mutual adds that Oglesby works and earns a comparable salary in the same regular occupation now as he did prior to his disability.

The policy defines "total disability" in this manner:

- You will be considered *totally disabled* if all these conditions are met:
- You are unable to do the substantial and material duties of your regular occupation. Your *regular occupation* is your usual work when total disability starts. If you are retired and not working when total disability starts, your regular occupation will be the normal activities of a retired person of like age and sex.
- Your total disability starts when this policy is in force.
- Your total disability results from sickness or injury.
- You are under a doctor's care. *Doctor* means a licensed physician other than yourself.

D.I. 61 at 34. Penn Mutual concedes that the policy was in force when Oglesby claims his disability began, and that his condition results from injury or sickness, and that he is under the care of a doctor. D.I. 60 at 17.

### A. Contract Interpretation: the Parties' Arguments

Penn Mutual's first summary judgment challenge to plaintiff's eligibility for benefits is twofold. First, Penn Mutual contends that the policy broadly defines plaintiff's "regular occupation" as a general radiologist, not the more narrowly circumscribed interventional and vascular radiologist. Second, Penn Mutual maintains that even if the policy allows for the latter construction, that is of no moment; it argues that the substantial and material duties of Oglesby's regular occupation are the same before and after the onset of disability: general radiology practice.

Plaintiff counters that the policy's language is clear and unambiguous, and that clear and unequivocal language in an insur-

ance policy must be given its ordinary and usual meaning. *See Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1995 (Del.1992). Under plaintiff's reasoning, the policy assesses regular occupation with a yardstick measuring usual work, defined as the substantial and material duties of that usual work at the commencement of total disability. This construction allows for flexible interpretation of regular occupation, as broadly or as narrowly required depending on the attributes of plaintiff's work as performed on a regular basis. With the appropriate factual predicate, this interpretation would allow for definition of Oglesby's pre-disability occupation as interventional and vascular radiology.

Penn Mutual refers the Court to *DiTommaso v. Union Central Life Ins. Co.,* C.A. No. 89–6323, 1991 WL 124601 (E.D.Pa. July 8, 1991), *aff'd mem.,* 972 F.2d 1330 (3d Cir. 1992), as a case akin to the instant controversy. In *DiTommaso,* the plaintiff was an osteopathic physician who was a general practitioner in both medicine and surgery. When he injured his left index finger, he could no longer perform surgery or manipulative therapy. The physician sued for benefits under a disability insurance policy, arguing that he could no longer perform a substantial portion of his major duties as an osteopath. *Id.* at *1.

Examining the language of the disability policy, the *DiTommaso* court found that the insured was due benefits when he was prevented "from engaging in his regular occupation." *Id.* at *3. Unlike the Penn Mutual policy, however, the *DiTommaso* policy did not attempt to illuminate the phrase "regular occupation." Significantly, the Court rejected any consideration of the osteopath's substantial and material duties, and instead consulted Webster's dictionary to construe "regular occupation" as simply meaning the "principal business of one's life." *Id.* The

court held that the physician was not disabled from practicing his regular occupation merely because he could not perform all of his previous surgical and manipulative responsibilities, so long as he could still function as an osteopath. *Id.*

At the summary judgment hearing in this matter, Penn Mutual argued that as long as plaintiff was still practicing within the same medical specialty (as opposed to sub-specialty), he would not be disabled under the policy. Defendant urged the Court to apply *DiTommaso* in this radiology context, suggesting that the insurance contract at bar is susceptible to a similar broad-based interpretation, as opposed to the interpretation advanced by plaintiff.[3]

The policy language "regular occupation" was ambiguous enough to raise a question in Oglesby's mind; upon receipt of his new insurance policy he petitioned Penn Mutual for clarification on this exact issue. Penn Mutual's initial response was "your regular occupation is as a radiologist." Finding this unsatisfactory, Oglesby sought and finally obtained written confirmation from Penn Mutual that his "regular occupation as a vascular interventional radiologist."

## B. Analysis of the Contract Provision

Construction of an insurance contract is purely a matter of law for the court. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992). Under Delaware law, if this insurance contract's language is reasonably or fairly susceptible of two or more interpretations, it may be found ambiguous. *Id.* However, the Court must take care not to destroy or twist policy language under the guise of construing it; the creation of ambiguity where none exists, could in effect, craft a new contract with rights, duties, and liabilities to which the

---

**3.** Penn Mutual also tried to persuade the Court that the phrase "regular occupation" should be interpreted as requiring attention to the amount of income earned by an insured, and because plaintiff remains at a comparable income level post-disability, he should not be adjudged disabled under the policy.

An interpretation must reflect a reasonable reading of the contractual language. *Aetna Cas.*

*and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990). In the description of its requirements for finding total disability, the Penn Mutual insurance policy makes no reference to income. Absent any mention of income, there is no reasonable basis for defining "regular occupation" based on the insured's income.

parties have not assented. *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982).

Despite the parties' machinations over the policy's definitional alternatives, both before and after this action was instituted, this Court need not necessarily find the language to be ambiguous. "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone–Poulenc Basic Chemicals Co.,* 616 A.2d at 1196 (Del.1992). In evaluating contractual language, the proper test is what a reasonable person in the position of the parties would have thought it meant. *Id.*

■ The Court finds that the policy terms defining "regular occupation" are clear on their face and subject to only one reasonable interpretation. In the plain meaning of the insurance policy's explicit terms, regular occupation is explained as one's usual work when total disability starts; an insured is totally disabled when he or she cannot do the substantial and material duties of that usual work. Therefore, if Oglesby's usual work was that of an interventional and vascular radiologist, and not a general radiologist, and he no longer could perform the substantial and material duties of that usual work, he would be entitled to Penn Mutual disability insurance benefits.[4]

■ However, even if the Court were to find that the contract language was susceptible to more than one reasonable interpretation, the analytical road would travel to the same destination reached under the plain meaning analysis. Normally, in contract actions, analyzing contract disputes is potentially a two step process; first, the court determines whether the contractual language

is ambiguous as a matter of law. *Pennbarr Corp. v. Insurance Co. of North America,* 976 F.2d 145, 149–50 (3d Cir.1992). If the Court finds as a matter of law that a contract is ambiguous, the fact finder must then determine which conflicting interpretation of the contract reflects the parties' intent. *Id.; Alexandria Coca–Cola Bottling Co. v. Coca-Cola Co.,* 637 F.Supp. 1220, 1225–1226 & n. 33 (D.Del.1984). Thus, under usual contract principles, if the Court finds ambiguity in a contract provision, the ambiguity raises an issue of fact which must be resolved at trial, thereby precluding summary judgment. *Chesapeake Utilities Corp. v. American Home Assur. Co.,* 704 F.Supp. 551, 562 n. 23 (D.Del.1989). *See also* 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.17[43], at 56–544 (2d ed. 1988).

■ In the insurance context, however, Delaware courts have formulated special rules of contract construction which differ from those applied to most other contracts. *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982). If there is any ambiguity in the policy, it must be resolved in favor of the insured and against the insurer that drafted the policy. *Aetna Cas. and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990). When presented squarely with ambiguous insurance provisions at summary judgment, Delaware courts have adhered to this rule of *contra proferentem,* consistently construing ambiguities in favor of the insured as a matter of law. *See e.g., Delledonne v. State Farm Mut. Auto. Ins.,* 621 A.2d 350 (Del.Super.Ct.1992); *Tumey v. Home Owners Warranty Corp.,* C.A. No. 89C–JN–47, 1991 WL 53450 (Del.Super.Ct.1991).

---

4. Penn Mutual also proposed that the policy contains an admission by plaintiff that his occupation was a general radiologist. On the application (which is incorporated by reference into the policy), in a one-line confine of space, Oglesby was asked to describe his "Occupation and Exact Daily Duties." Oglesby answered by squeezing in "Physician–Radiologist–Diagnostic Radiology–Director of Interventional and Cardiovascular Radiology."

The Court rejects this proposal. The application's provision, "Occupation and Exact Daily Duties," parallels the language in the definitional section where the general term "regular occupa-

tion" is modified in terms of the more specific references to usual work and substantial and material duties of the regular occupation. Under the plain meaning of the policy, nomenclature chosen by the insured on the application is not dispositive; occupation is defined by the insured's usual work when totally disability starts. Additionally, regular occupation is defined at the time of onset of disability, when the insured's occupation may have changed from that which was represented on the policy application. D.I. 61 at 34; *see also* defendant's Reply Brief, D.I. 65 at 3–4.

The case of *Rahman v. Paul Revere Life Ins. Co.*, 684 F.Supp. 192, 195 (N.D.Ill.1988), mirrors many of the facts and the law of the instant case and is instructive in its ambiguity analysis. Rahman was an emergency cardiology physician working primarily at a hospital. *Id.* at 193. An essential aspect of his occupation was to "run to the bedside of patients in cardiac distress to administer aid." *Id.* When he severely injured his leg and was prevented from running, he filed a claim for benefits under his disability insurance policy. *Id.* After paying benefits for three years, the insurer ceased payment when it discovered Dr. Rahman's healthy practice as a general cardiologist. *Id.* at 197.

Like Penn Mutual, the insurer in *Rahman* argued for a broad construction of the term "regular occupation", and tried to persuade the court to define the insured's occupation as within the medical specialty of cardiology, rather than the sub-specialty of emergency cardiology. *Id.* at 194–95. On plaintiff's motion for summary judgment, the court found that the policy did not clearly define "regular occupation", and resolved the ambiguity in favor of the insured as a matter of law. *Id.* at 195. The court concluded that Rahman's "regular occupation" was the in the sub-specialty of emergency cardiologist, and dismissed as "irrelevant whether or not Dr. Rahman [was] able to do the duties of a general cardiologist." *Id.*

Similarly, if the Penn Mutual policy's definition of "regular occupation" is ambiguous, under principles of *contra proferentem*, the Supreme Court of Delaware would likely hold that the policy could define "regular occupation" as narrowly as the sub-specialty of interventional and vascular radiologist. In addition, Delaware courts have long looked to relevant facts and circumstances surrounding a contract, such as the actions of the parties, to ascertain the meaning of ambiguous contractual language. *Artesian Water Co. v. State Dep't of Highways and Transp.*, 330 A.2d 441, 443 (Del.1974) (citations omitted); *see generally* 3 Corbin on Contracts §§ 543, 558 (1960).

■ An agreed interpretation of the clause at issue by the parties, especially before the controversy arises, is an important aid in the interpretation of alleged uncertain terms. *Pacific Indem. Co. v. Interstate Fire and Cas. Co.*, 302 Md. 383, 488 A.2d 486, 489 (1985); *Celley v. Mutual Benefit Health and accident Assn.*, 229 Pa.Super. 475, 324 A.2d 430, 435 (1974). A prior construction given by the insurance company itself "must be considered as very persuasive." *Meier v. New Jersey Life Ins. Co.*, 195 N.J.Super. 478, 480 A.2d 919, 923 n. 3 (A.D.1984), *aff'd*, 101 N.J. 597, 503 A.2d 862 (1986). Thus, Penn Mutual's interpretation of "regular occupation" as interventional and vascular radiology in its May 5, 1987 letter must be accorded great weight. This letter resolves any putative ambiguity in favor of the plaintiff; any contrary argument arising after a claim has been filed against the company is disingenuous.

■ Under either a plain meaning or ambiguity analysis, the Court holds that the Penn Mutual policy could define plaintiff's regular occupation as narrowly as the sub-specialty of interventional and vascular radiology. This case aptly demonstrates Holmes' remark "that the making of a contract depends ... not on the parties' having *meant* the same thing but on their having *said* the same thing." Oliver Wendell Holmes, *The Path of the Law, in Collected Legal Papers* 167, 178 (1920). Payment of disability benefits to this plaintiff, working in a related discipline to his original field of endeavor, may not be a result foreseen or intended by Penn Mutual, but it is the result for which it contracted.

## C. Penn Mutual's Fallback Position

Penn Mutual, perhaps in anticipation of the outcome of its first argument, insists that it is nevertheless entitled to summary judgment in its favor. According to Penn Mutual, if the policy terms define Oglesby's regular occupation as his usual work, Penn Mutual asserts that as a matter of law, the Court should find plaintiff's usual work both and pre- and post-disability was that of a general radiologist.

Penn Mutual anchors its position in an audit of Oglesby's 1988–1989 billing records which revealed that prior to the onset of his

disability, Oglesby functioned as a interventional and vascular radiologist for only 10.3% and 9.2% of the time, respectively. D.I. 61 at 227. These data imply that the substantial majority of the plaintiff's pre-disability duties entailed general radiology and administrative functions, responsibilities unaffected by his medical condition.

Plaintiff rejoins by characterizing the audit of the billing statistics as invalid for several reasons. First, he argues, the accuracy of the billing data is questionable because of possible widespread data entry error from plaintiff's faulty office procedures. Radiological procedures attributed to Oglesby may have been performed by another radiologist, and vice versa. Plaintiff claims that Penn Mutual had notice in January 1993 of the data's defects before it performed the audit a month later. D.I. 63 at 20–22.

Second, plaintiff denigrates the competency of defendant's auditor, a certified public accountant, to medically categorize the billing data as either interventional or non-interventional. Finally, Oglesby offers evidence which was disclosed to Penn Mutual early in discovery: in both his replies to interrogatories and at deposition, plaintiff attested under oath that at the onset of his disability he spent 80–100% of his professional time as a interventional and vascular radiologist. D.I. 61 at 98, 285. As proof of his shift of responsibilities after onset of disability, plaintiff offers his cancellation of medical malpractice insurance pertaining to interventional and vascular procedures. D.I. 61 at 172 (last notation).

Plaintiff's and defendant's versions of the facts are widely divergent. Because there is an abundance of genuine issues of material fact relating to plaintiff's regular occupation under this disability insurance policy, this issue cannot be disposed of at summary judgment. Penn Mutual's motion for summary judgment based on this first ground will be denied.

## II. NOTICE AND PROOF OF LOSS

Penn Mutual argues a second ground for full summary judgment based on Oglesby's alleged failure to give the insurer timely notice of his disability and timely proof of his loss.

### A. Notice

█ The policy requires that an insured "give [Penn Mutual] written notice of claim within 20 days after any covered loss starts or as soon as reasonably possible." D.I. 61 at 36. After Penn Mutual receives notice from an insured, it requires that the insured give proof of his or her loss, describing "how the loss occurred, its nature and its extent." Id.

The record shows Penn Mutual as receiving notification of plaintiff's disability on June 12, 1992. D.I. 61 at 233. As per the policy, defendant dispatched a claim form for Oglesby's written confirmation of notice; he completed and returned the form within 10 days. Plaintiff wrote that he was not able to perform any interventional and vascular radiology procedures since August 1990.[5] Penn Mutual acknowledges that the policy's notice provision allows for notice to be given within 20 days or as soon as reasonably possible.

To skirt the summary judgment hurdle on its claim for untimely notice, Penn Mutual "must show both that the policy was breached and that it was prejudiced by the violation," both as a matter of law. *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del.1990); *State Farm Mut. Auto. Ins. Co. v. Johnson*, 320 A.2d 345, 347 (Del.1974); *Falcon Steel Co. v. Maryland Cas. Co.*, 366 A.2d 512, 516 (Del.Super.Ct.1976). The Court holds that Penn Mutual has failed to meet these requirements for summary judgment.

First, the issue of reasonability of an insured's notice is normally a question for the fact finder. *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 315 A.2d 585 (Del.1973) (rea-

---

5. Although plaintiff did resume interventional and vascular radiology duties from June 1990 to August of 1990, the insurance policy aggregates as one continuous period of disability the days of disability in April and May with those disability days starting in August. D.I. 61 at 36. For purposes of this second summary judgment motion, Penn Mutual argues that the earlier date of April 1990 should control.

sonableness of notice depends on the facts and circumstances of each case); *Frey v. Security Insurance Co. of Hartford,* 331 F.Supp. 140, 144 (W.D.Pa.1971), *aff'd mem.,* 473 F.2d 1031 (3d Cir.1973) (reasonableness of notice a question of fact for jury). Penn Mutual has not tendered any evidentiary basis for deviation from that norm.

On the other hand, Oglesby offers deposition testimony that in November 1991 a Penn Mutual agent, Robert Altemus, recommended that plaintiff *not* give notice of his disability to Penn Mutual. D.I. 63 at 5–6. According to plaintiff, Altemus advised plaintiff that notice was unnecessary so long as plaintiff's physicians were still prognosticating recovery. *Id.* Oglesby, in reliance of Altemus's instruction, refrained from filing a claim for benefits until his final diagnosis of disability.

To its credit, Penn Mutual makes the appealing argument that plaintiff's insurance policy covers *total* disability, which is not necessarily *permanent,* and that plaintiff should have filed his claim within 20 days of onset of his disability in 1990. This assertion, however, gets muddled among the echoes of agent Altemus's advice that plaintiff should withhold notice. In effect, plaintiff has raised an estoppel and reliance argument.

It is well settled that estoppel may not be invoked to make a new contract of insurance or to change radically the terms of the policy to cover additional subject matter. *State Farm Mut. Auto. Ins. Co. v. Deeble,* C.A. 83C–JA–89, 1987 WL 8683 *2 (Del.Super.Ct. January 29, 1987). Nevertheless, courts are to be liberal in finding existence of facts upon which a waiver or estoppel may be predicated. *Standard Accident Ins. Co. v. Ponsell's Drug Stores,* 57 Del. 485, 202 A.2d 271 (1964). Here, plaintiff seeks only to justify the reasonableness of his notice, a matter required of him subsequent to his loss, which does not alter the nature of Penn Mutual's risk or increase its liability. *Id.*

Delaware law dictates that summary judgment would not be appropriate in this case if a rational trier of fact, viewing the facts in the light most favorable to non-moving party, including any reasonable inferences therefrom, could find evidence invoking estoppel. *First Fed. Sav. and Loan Ass'n v. Nationwide Mut. Fire Ins. Co.,* 460 A.2d 543, 545 (Del.1983). Here, Oglesby has demonstrated a triable issue of estoppel: he sought counsel from a designated Penn Mutual agent, who was apparently, if not actually, charged with authority to advise plaintiff about compliance with the policy's notice provisions.[6] In November 1991, the agent told plaintiff he need not file notice of his disability. Oglesby has also shown how in reliance on the advice, he delayed notice until a final diagnosis of disability. Penn Mutual cannot now assert a contractual condition that it, through words or conduct, may have implied would not be asserted as a legal defense. *First Fed. Sav. and Loan Ass'n,* 460 A.2d at 545. Under these facts, the Court holds that there is a genuine issue of material fact whether plaintiff's notice to Penn Mutual was unreasonable *vel non.*

Parenthetically, the Court notes that even if plaintiff's notice was unreasonably delayed as a matter of law, Penn Mutual still has the burden of proving it was prejudiced by the delay. *Nationwide Mut. Ins. Co. v. Starr,* 575 A.2d 1083, 1088 (Del.1990); *State Farm Mut. Ins. Co. v. Johnson,* 320 A.2d 345, 347 (Del.1974). Defendant has alleged prejudice arising from the destruction of certain scheduling records, preventing its investigation into Oglesby's claim. Plaintiff, however, at oral argument, directed the Court to the existence of medical reports which comprise superior evidence to that allegedly destroyed. D.I. 61 at 185. These are genuine issues for the fact finder to resolve as well.

**B. Proof of Loss**

 Undaunted, Penn Mutual also argues that plaintiff failed to file his proof of

---

**6.** Without information to the contrary, the Court assumes that the individuals described in this action as insurance agents were in fact cloaked with agency powers under Delaware law. Penn Mutual has not challenged Oglesby's characterization of Altemus as its agent, as opposed to a mere broker, who may be an agent of the insured. Cf. *Giangrant v. Richard A. Parsons Agency,* C.A. No. 83C–JN–26, 1988 WL 22325, 1988 Del.Super. LEXIS 80 (Del.Super.Ct. March 4, 1988); 18 Del.C. §§ 1702–03.

loss within the time frame required by both the insurance contract and by 18 Del.C. § 3311.[7] Under the insurance policy, Penn Mutual must receive both written notice of the insured's claim and proof of the loss. Penn Mutual normally sends proof of loss forms within 15 days of receiving an insured's notice. Proof of loss forms detail the precise nature and extent of an insured's claim and how the disability occurred. Plaintiff received, completed, and returned his proof of loss forms within 10 days of Penn Mutual's receipt of his original notice. D.I. 285 at 233.

The insurance policy also set forth the procedure and time frame for filing proof of loss:

When we receive notice of your claim, we will send you claim forms. These forms ask for facts that prove your loss....

You must give us written proof of loss within 90 days after:

● each disability period for which we are liable; or

● the occurrence of any other loss for which you are covered.

If you fail to give proof within this time because it is not reasonably possible, we will not reduce or deny your claim. But you must give proof of loss as soon as it is reasonably possible to do so. And you must give this proof within one year after the time limit unless you are legally unable to do so.

After we receive proof of loss, we will pay monthly all benefits then due for disability.

*Id.* at 36–37. Penn Mutual maintains this provision required plaintiff to submit proof of loss within 90 days of the onset of his disability, or at the latest, within the limitations period of one year plus 90 days. Because Oglesby states he has been disabled since

August 1990, but did not file a claim and proof of loss until June 1992, Penn Mutual denies any obligation to pay plaintiff's claim.

Oglesby argues that the clause "90 days after each disability period for which we are liable" does not translate into 90 days after the onset of disability. Rather, plaintiff would have the Court interpret this language to mean the 90 days does not start to run until the termination of the time period in which plaintiff was disabled. Stated differently, under Penn Mutual's construction, the onset of disability triggers the 90 day plus one year period of limitations; plaintiff contends the clock does not start ticking until after his disability ends.

Defendant cites to a triumvirate of cases, all purporting to support its view on this issue. Close scrutiny of these cases, however, shows they are all inapposite, specifically referencing the different focal point "date of *actual loss*," not the time frame "after each disability period". *See Hunter v. Fireman's Fund Ins. Co.*, 448 F.2d 805 (10th Cir.1971) (proof of loss to be furnished within 90 days of date of loss); *Thomas v. Transamerica Occidental Life Ins. Co.*, 761 F.Supp. 709 (D.Or.1991), *aff'd*, 977 F.2d 591 (9th Cir.1992) (proof of loss required within 90 days of date of loss); *Nelson v. Insurance Co. of North America*, 264 F.Supp. 501 (D.N.J.1967) (proof of loss within "90 days after the date of such loss").

No Delaware court has interpreted § 3311 or a policy that tracks it. Therefore, as a federal court sitting in diversity, this Court must predict how the Supreme Court of Delaware would resolve this issue were it called upon to do so. *Wiley v. State Farm Fire and Cas. Co.*, 995 F.2d 457, 459 (3d Cir.1993). Although this assignment may be speculative in nature, it is nonetheless a task which the Court may not decline. *McKenna v. Ortho*

7. The policy tracks the language of this statute in simpler language. Section 3311 provides:

Written proof of loss must be furnished to the company at its said office in case of claim for loss for which this policy provides any periodic payment contingent upon continuing loss within ninety days after the termination of the period for which the company is liable.... Failure to furnish such proof within the time

required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

18 Del.C. § 3311.

*Pharmaceutical Corp.*, 622 F.2d 657, 661–62 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). In carrying out this charge, the Court may consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Nationwide Ins. Co. v. Resseguie,* 980 F.2d 226, 230 (3d Cir.1992) (quoting *McKenna,* 622 F.2d at 661–62)).

Of the courts that have construed disability insurance contract provisions analogous to that found in the Penn Mutual policy, the majority of them have agreed with plaintiff's position that a disability insurance claimant need not submit proof of loss until the termination of the period in which the insured was disabled. *See Clark v. Massachusetts Mut. Life Ins. Co.,* 749 F.2d 504, 507 (8th Cir.1984) (applying Arkansas law); *Liberto v. Mut. Benefit Health & Accident Ins. Co.,* 323 F.Supp. 1274, 1276 (W.D.Pa.1971) (applying Pennsylvania law); *Meltzer v. Mutual Benefit Health & Accident Ass'n,* 150 F.Supp. 300, 301 (E.D.Pa.1957); *Goodwin v. Nationwide Ins. Co.,* 656 P.2d 135, 143–44 (Ct.App.Idaho 1982); *Continental Cas. Co. v. Freeman,* 481 S.W.2d 309, 312 (Ky.1972) [8]; *Yuratich v. Continental Cas. Co.,* 517 So.2d 1212, 1214 (Ct.App.La.1987), *writ denied,* 519 So.2d 145 (La.1988); *Laidlaw v. Commercial Ins. Co. of Newark,* 255 N.W.2d 807, 811 (Minn.1977); *Turner v. Mutual Benefit Health & Accident Ass'n,* 5 Misc.2d 524, 160 N.Y.S.2d 883, 889 (N.Y.Sup.Ct.1957), *aff'd,* 5 A.D.2d 951, 172 N.Y.S.2d 571 (1958); *Wall v. Pennsylvania Life Ins. Co.,* 274 N.W.2d 208, 214 (N.D. 1979); *Proctor v. Southland Life Ins. Co.,* 522 S.W.2d 261, 264–65 (Tex.Civ.App.1975). *See also* John Appleman and Jean Appleman, 3 *Insurance Law and Practice* § 1393 (2d ed. 1967) (1993 supp.) (insured is only required to furnish proof of the loss within 90 days after the termination of the aggregate period for which the insurer is claimed to be liable). *But see Nikaido v. Centennial Life Ins. Co.,* 42 F.3d 557 (9th Cir.1994) (applying California law); *Goff v. Aetna Life and Cas. Co.,* 1 Kan.App.2d 171, 563 P.2d 1073 (1977); *Mosior v. Insurance Co. of North America,* 193 N.J.Super. 190, 473 A.2d 86 (1984).

Generally, the interpretation that plaintiff advances has been characterized as the most natural interpretation.[9] *Laidlaw v. Commercial Ins. Co. of Newark,* 255 N.W.2d at 811; *see also Continental Cas. Co. v. Freeman,* 481 S.W.2d at 311–12 (there is no reason not to construe the phrase "as meaning just what it says"). One court has posited that such a policy provision demonstrates that "the policy itself contemplates that proof of loss may be submitted after disability terminates; and at least to some extent, difficulty the insurer may have in investigating a disability that has already ended is part and parcel of the insurance agreement." *Clark v. Massachusetts Mut. Life Ins. Co.,* 749 F.2d at 507. The Penn Mutual policy defines a period of disability as one which "ends when you can do, full-time, all the substantial and material duties of your regular occupation." D.I. 61 at 36. Read together with the language at issue, the two contractual provisions seem to indicate that the "period for which the company is liable" is the period of the insured's disability.

Although this interpretation may theoretically result in an insured's postponement of proof filing, another court has rationalized that an insured is not likely to delay filing proof of loss because he will want to receive benefits as soon as possible. *Laidlaw,* 255 N.W.2d at 812. In the instant case, this holds true: plaintiff submitted his proof of loss forms almost immediately after receiving them from Penn Mutual in June 1992. Several courts have tempered the potential harshness of this interpretation in factual scenarios not present here, by acknowledging

---

**8.** The *Continental Casualty* court, in perhaps the most non pareil fashion, observed, "Sometimes, however, as in this instance, figuring out exactly what the language of an insurance policy says would leave a Philadelphia lawyer with astigmatism." *Continental Cas. Co. v. Freeman,* 481 S.W.2d at 317.

**9.** Since policy provision is required by statutory mandate, the Court looks to rules of statutory construction. In Delaware, where possible, courts are to construe statutes according to their ordinary and natural meaning. *Sostre v. Swift,* 603 A.2d 809 (Del.1992); *Director of Revenue v. Stroup,* 611 A.2d 24 (Del.Super.Ct.1992).

the insurer, under the appropriate circumstances, is not foreclosed from asserting an equitable defense such as laches. *Goodwin,* 656 P.2d at 142; *Laidlaw,* 255 N.W.2d at 812.[10]

The Court holds that the Delaware Supreme Court would follow the general weight of authority on this issue. Under the terms of the Penn Mutual policy, plaintiff did not have to submit proof of loss until 1 year and 90 days after the termination of the period for which Penn Mutual is liable, that is, the period of Oglesby's disability. Having failed to prove the absence of a genuine issue of material fact as to notice and proof of loss, summary judgment as to defendant Penn Mutual's second ground will be denied.

## III. RESCISSION OF POLICY RIDERS

In its third summary judgment argument, Penn Mutual petitions the Court to rescind policy amendment riders issued to plaintiff in the years 1989, 1990, 1991, and 1992. Defendant contends that plaintiff repeatedly misrepresented his medical history during the application process for his disability insurance; defendant bases its rescission argument on the alleged misrepresentations. Because the two year contestability period in the original policy has expired, Penn Mutual seeks rescission of only those riders, not the entire insurance policy.

The burden of proof on this issue rests on Penn Mutual. *See* 3A Appleman at § 1853. A movant for summary judgment who has the burden of proof at trial has been said to be held to a "more stringent" standard. *National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1582 (3d Cir. 1992). Consequently, to prove that no genuine factual issues exist, Penn Mutual "must present a factual scenario without any unex-

plained gaps." *Id.* (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970)).

Each February 1, plaintiff exercised his option to purchase, for an additional premium, an amendment rider which increased by five percent any benefits payable for disability. Each of the amendment riders for 1989–1992 contained an incontestability clause, which set temporal limits on Penn Mutual's right to challenge the insurance policy:

> *Contesting this Rider*
>
> If this rider provides for an increase in benefits, then the time period in the [base policy] provision '*Contesting this Policy/Incontestable*', as regards the increase, will start from this rider's effective date.

D.I. 61 at 41–44.

This reference to the base policy's incontestability provision necessarily requires an examination of that provision. The original policy contained a two year incontestability clause pertaining to statements made by Oglesby on his application:

> *Contesting this Policy*
> *Misstatements in The Application*
>
> We rely on the statements you make in your application. We will not contest those statements after this policy has been in effect for 2 years during your lifetime. Any length of time you are disabled is excluded in computing this 2 year period.

*Id.* at 49. Because Oglesby maintains he became disabled in 1990, less than two years after February 1989, he does not dispute that the 1989–1992 benefits riders are contestable for two years each beginning at their individual issue dates. D.I. 62 at 33. He does not concede, however, that he made any misrepresentations to the Penn Mutual on his policy application.[11]

---

10. In this case, however, where the plaintiff has demonstrated a triable issue of estoppel as to notice, it follows that the insurer may be estopped from asserting delayed filing of the proof of loss. Common sense dictates that proof of loss cannot predate notice; that is, receipt of the proof of loss forms is dependent upon first giving notice. If plaintiff's notice was not unreasonable, and he immediately filed proof of loss documentation, then it is counterintuitive that his claim would be barred because of non-compliance with the policy's provisions. Additionally,

even if defendant was to prevail on its view of the limitations period here, the estoppel may toll the running of the limitations period. *Radzewicz v. Neuberger,* 490 A.2d 588, 592 (Del.Super.Ct.1985). *Accord Closser v. Penn Mut. Fire Ins. Co.,* 457 A.2d 1081, 1088 (Del.1983).

11. Penn Mutual agreed at oral argument that in rescinding a contract for fraud, it must make, or offer to make, restitution so far as possible. *See* 3A Appleman at § 1832. If an incontestability clause is contained in the policy, rescission with-

Penn Mutual avers that plaintiff concealed evidence material to the assumption of the disability risk in this case, and points to the incomplete medical history reported by plaintiff on the disability insurance application. When asked on the application if he ever "had any known indication of or been treated for ... [any] disease or disorder in the "bones including spine, back or joints," plaintiff failed to recount his 1981 episode of cervical spine arthritis. At deposition, plaintiff could not articulate why he omitted his history of cervical spine arthritis. D.I. 61 at 125.

In this action, as in all insurance cases, it is a fundamental principle in insurance law that both the insured and the insurer have a duty to deal with each other with utmost fairness. *Prudential Ins. Co. of America v. Ford,* 37 Del.Ch. 425, 144 A.2d 234 (1958); *see also Dickson–Witmer v. Union Bankers Ins. Co.,* C.A. No. 92–C–07–107, 1994 WL 164554 *4 (Del.Super.Ct. April 27, 1994) (quoting *American Cas. Co. of Reading, Pennsylvania v. Ford,* 41 Del.Ch. 39, 187 A.2d 425, 427 (1963)). Accordingly, when seeking insurance coverage, Oglesby had a duty to disclose information concerning any material physical disease in his past that was known to him in order for there to be an enforceable contract. *Prudential Ins. Co. of America v. Gutowski,* 49 Del. 233, 113 A.2d 579 (1955); *American Cas. Co. of Reading, Pennsylvania,* 187 A.2d at 427 (Del.Ch.1963).

A review of the record in this case reveals ample evidence demonstrating that as a matter of law, plaintiff did not act with the requisite "utmost fairness" to Penn Mutual when applying for his disability insurance. First, the Court is mindful that plaintiff is a physician, and as such, is charged with a higher acumen for things medical. This specialized knowledge applies in full force even to his own medical history.

Second, Oglesby signed the application and certified it to be true, complete, and correctly recorded, even though it was incomplete. The questions asked on the application were

clear and in plain English. A person of normal intelligence, not necessarily a medical professional, would have known and understood what he was signing. *See American Cas. Co. of Reading, Pennsylvania v. Ford,* 41 Del.Ch. 39, 187 A.2d 425, 427 (1963); *Prudential Ins. Co. of America v. Ford,* 37 Del. Ch. 425, 144 A.2d 234, 237 (1958).

Even if Oglesby cannot be charged with the responsibility to read the entire insurance policy, he is held responsible for reading those portions, such as the application, which involve information he provided, and which were required to be truthful at the risk of voiding the policy. *Cf. Riblett v. Horace Mann Ins. Co.,* C.A. No. 12884, 1994 WL 449110 *2 (Del.Ch. Aug. 11, 1994). *See also* 17 Appleman at § 9450 (every person is charged with the duty to read the application to which he subscribes and report any misrepresentations or omissions to the insurer); 44 Am.Jur.2d *Insurance* § 1634 (1982) (same). Plaintiff has admitted that he does not recall whether he actually read through the forms he signed and certified. D.I. 61 at 128. In view of plaintiff's unqualified written certification that he had read the incomplete answers before signing the document, that they were correctly written, true, and complete, the conclusion is inevitable that he did not act in utmost fairness when signing the factually deficient application. *See Prevete v. Metropolitan Life Ins. Co.,* 343 Pa. 365, 22 A.2d 691, 693 (1941); *Van Riper v. Equitable Life Assur. Soc.,* 561 F.Supp 26 (E.D.Pa. 1982), *aff'd mem.* 707 F.2d 1397 (3d Cir. 1983).

In addition, plaintiff affirmatively solicited Penn Mutual to restrict an exclusionary provision relating to his arthritis. Originally, Oglesby would not be eligible for insurance benefits for disability stemming from *any* impairment due to degenerative arthritis. D.I. 61 at 173. Despite his knowledge of his history of cervical spine arthritis, he negotiated with Penn Mutual to limit this exclusion, and influenced the insurer to a limit the

in the time of contestability is required where the insurer claims fraudulent inducement through misrepresentations. *Id.* Since plaintiff concedes that the contestability period is still open, defen-

dant's action for rescission and offer to refund plaintiff's premiums in the event of rescission are timely. *Id.*

exclusion to degenerative arthritis of merely the hip region.

These record facts, taken together, demonstrate that as a matter of law, plaintiff did not fulfill his obligation of utmost fairness when representing his medical history to Penn Mutual.[12] Plaintiff admits that he was aware of his history of cervical spine arthritis and the application as signed by him contained incomplete representations. D.I. 61 at 127. Delaware courts have consistently held that where rescission based on misrepresentation is sought, it is enough that the insured knew his statements were false or had reason to believe them to be incorrect. *Prudential Insurance Co. v. Gutowski*, 49 Del. 233, 113 A.2d 579, 582 (1955); *Pacific Ins. Co. v. Higgins*, C.A. No. 11284, 1992 WL 212601, 1992 Del.Ch. LEXIS, (Del.Ch. September 2, 1992); *see also Assiniboia Corp. v. Chester*, 355 A.2d 873, 879 (Del.Super.Ct.1974), *aff'd*, 355 A.2d 880 (Del.1976) (failure to disclose conditions affecting the risk, of which the insured is aware, makes the contract voidable at the insurer's option). Twice Oglesby whitewashed his medical history when he had reason to know to do otherwise.

■ The remaining question is whether Oglesby's misrepresentation falls within the criteria preventing a recovery under a policy as set forth in § 2711 of the Delaware Insurance Code, which provides that

> All statements and descriptions in any application for an insurance policy or annuity contract by or in behalf of the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
>
> (1) Fraudulent; or
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

18 Del.C. § 2711. Under Delaware law, disclosure of minor or temporary ailments are treated as immaterial or left to the jury to decide materiality, *Prudential Ins. Co. v. Gutowski*, 49 Del. 233, 113 A.2d 579, 581 (1955), while concealment of serious disease or ailments has been held by Delaware courts to be material as a matter of law. *Id.*

Peter Sokop, the underwriter who evaluated Penn Mutual's risk in this case, has testified that had he known of plaintiff's cervical arthritis, he would have definitely placed an exclusion for that condition into the disability policy. D.I. 61 at 267. Under other circumstances, this declaration could be rightly dismissed as merely post hoc; here, however, when coupled with his actions at the time he underwrote the policy, the underwriter's risk aversion is manifest. When presented in 1986 with plaintiff's history of degenerative hip arthritis, Sokop insisted on an exclusion for that condition, even though plaintiff had undergone prosthetic surgery to alleviate the hip arthritis. Without any similar curative

---

**12.** Penn Mutual also argued that because its medical examiner did not document plaintiff as reporting his history of cervical arthritis, plaintiff concealed it during his medical examination and interview as well. Plaintiff questions the accuracy of the examiner's documentation, based on a misnumbered notation. The medical examiner noted that plaintiff reported his history of "degenerative changes in lumbar spine—no symptoms." Instead of appropriately correlating this information with question 2(h), she cross-referenced it to question "4(g)", which did not exist. Oglesby states that he is "sure he must have

mentioned" his history of both lumbar and cervical spine problems, and argues that the examiner failed to chronicle the information correctly. D.I. 61 at 133. He did, however, sign this document, certifying that he read it, it was true, accurate, and complete. D.I. 61 at 53.

If these facts constituted the sole basis for Penn Mutual's misrepresentation argument, the Court would be faced with a much closer call at summary judgment. However, as the record contains other sufficient evidence to decide Penn Mutual's summary judgment motion, the Court has not considered these facts.

treatment for Oglesby's cervical arthritis, it is inescapable that Sokop would have excluded it as well, had he known about it.

Plaintiff has not adduced any evidence undermining Sokop's assertions or underwriting practices. Sokop's actions in 1986, together with his current testimony, leave no room for doubt that the Court should find that Penn Mutual is entitled to summary judgment under the second and third prongs of 18 Del.C. § 2711 and *Prudential Ins. Co. v. Gutowski*. But for plaintiff's misrepresentations, Penn Mutual "would not have provided coverage with respect to the hazard," here, cervical arthritis, "resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise." Therefore, under its equitable power, the Court will grant summary judgment in favor of Penn Mutual on the issue of rescission of the 1989–1992 benefit increase riders, and order Penn Mutual to refund the premiums for those riders to the plaintiff.

## IV. 1991–1992 BENEFIT INCREASE RIDERS

Without conceding plaintiff's disability, Penn Mutual moved for partial summary judgment on the issue of Oglesby's entitlement to benefits under the two benefit increases riders issued effective February 1, 1991 and February 1, 1992. Under the terms of these riders, if Oglesby was already disabled on the increase effective dates, he would not be eligible for the increase. Because the Court has already ruled that these benefit riders are to be rescinded and the premiums refunded, any contestability issue as to these riders is moot.

## CONCLUSION

Having found genuine issues of material fact, the Court denies defendant's motion for full summary judgment. The Court grants defendant's motion for partial summary judgment, and orders that the 1989–1992 policy amendment riders increasing plaintiff's insurance benefits are to be rescinded, and the premiums for those riders be refunded to plaintiff. Having thus disposed of defendant's first three grounds for summary judg-ment, the fourth ground is moot and need not be reached.

## *OPINION ON MOTION FOR REARGUMENT*

[February 16, 1995]

MURRAY M. SCHWARTZ, Senior District Judge.

## INTRODUCTION

Plaintiff John T. Oglesby has moved for Reargument pursuant to Local Rule 7.1.4 following an adverse partial summary judgment entered by opinion and order of this Court on December 23, 1994. In its December 23, 1994 order, the Court ruled that four insurance policy benefit riders issued by defendant Penn Mutual for the years 1989–1992 were to be rescinded. In so ruling, the Court found as a matter of law that while applying for his disability insurance policy, plaintiff concealed information material to Penn Mutual's "acceptance of the risk or to the hazard" it was to assume. 18 *Del.C.* § 2711(2). The Court also found that but for plaintiff's misrepresentations, Penn Mutual "would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise." 18 *Del.C.* § 2711(3).

Familiarity with the Court's prior opinion is assumed for current purposes. For the reasons discussed below, plaintiff's motion for reargument will be denied.

## DISCUSSION

### A. Rescission of the Insurance Policy Riders

In his motion for reargument, plaintiff does not take issue with the Court's explication of the applicable law in this case. Delaware has codified its law of rescission of insurance contracts at 18 *Del.C.* § 2711, which, in relevant part, provides:

Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

18 *Del.C.* § 2711 (1989). Thus, to make an enforceable insurance contract under Delaware law, plaintiff had a duty to disclose information concerning any material physical disease in his past. *Prudential Ins. Co. of America v. Gutowski,* 49 Del. 233, 113 A.2d 579 (1955); *American Cas. Co. of Reading, Pennsylvania v. Ford,* 41 Del.Ch. 39, 187 A.2d 425, 427 (1963).

To find misrepresentation under the statute, it is enough that the plaintiff knew his statements were false or had reason to believe them to be incorrect. *Prudential Ins. Co. v. Gutowski,* 49 Del. 233, 113 A.2d 579, 582 (1955); *Pacific Ins. Co. v. Higgins,* C.A. No. 11284, 1992 WL 212601, 1992 Del.Ch. LEXIS, (Del.Ch. September 2, 1992); *see also Assiniboia Corp. v. Chester,* 355 A.2d 873, 879 (Del.Super.Ct.1974), *aff'd,* 355 A.2d 880 (Del.1976) (failure to disclose conditions affecting the risk, of which the insured is aware, makes the contract voidable at the insurer's option).

Finally, Delaware insurance law requires both the insured and the insurer to deal with each other with utmost fairness. *Prudential Ins. Co. of America v. Ford,* 37 Del.Ch. 425, 144 A.2d 234 (1958); *see also Dickson–Witmer v. Union Bankers Ins. Co.,* C.A. No. 92–C–07–107, 1994 WL 164554 *4 (Del.Super.Ct. April 27, 1994) (quoting *American Cas. Co. of Reading, Pennsylvania v. Ford,* 41 Del.Ch. 39, 187 A.2d 425, 427 (1963)). For example, where plaintiff affixed his signature to documents memorializing his representations to Penn Mutual, and certified the information as true, complete, and accurate, plaintiff was charged with a duty to review those statements to which he subscribed and report any misrepresentations or omissions to Penn Mutual. John Appleman and Jean Appleman, 17 *Insurance Law and Practice* § 9450 (2d ed. 1967); 44 Am.Jur.2d *Insurance* § 1634 (1982). *Cf. Prevete v. Metropolitan Life Ins. Co.,* 343 Pa. 365, 22 A.2d 691, 693 (1941); *Van Riper v. Equitable Life Assur. Soc.,* 561 F.Supp. 26 (E.D.Pa.1982), *aff'd mem.,* 707 F.2d 1397 (3d Cir.1983).

The evidentiary record in this case plainly revealed, *inter alia,* that plaintiff had a history of arthritis in his hips and cervical (neck) spine. When plaintiff applied for his disability insurance policy, he was asked on the Penn Mutual policy application if he ever "had any known indication of or been treated for ... [any] disease or disorder in the "bones including spine, back or joints." Docket Item ("D.I.") 61 at 47. Although plaintiff, a physician, vividly remembered at deposition his previous diagnosis and flare up of cervical arthritis, he did not disclose it on the Penn Mutual application. *See Id.* at 107–116. Instead, he chronicled only his history of hip arthritis. After completing the application in his own hand, plaintiff then certified that he reviewed and read his recorded answers, and that the answers were true, complete, and accurately recorded to the best of his knowledge. *Id.* at 48. Plaintiff freely admits that he knew of his cervical arthritis when he applied for the disability policy. *Id.* at 136.

Plaintiff was also required to submit to an insurance medical exam and interview. As the Penn Mutual medical examiner conducted her exam, she asked plaintiff about his medical history pursuant to questions on a Penn Mutual "Medical Examiner's Report" form. One question specifically queried, "Have you ever been treated for or had any indication of: Arthritis, gout, or disorder of muscles, bones or joints?" *Id.* at 45. The medical examiner documented plaintiff as reporting a history of hip problems, including a hip replacement, and "degenerative changes" in his lumbar spine, with "no symptoms." *Id.* Nowhere on the form was there any revelation of plaintiff's prior diagnosis or clinical manifestation of his cervical arthritis.

Again, plaintiff certified that his statements, reduced to writing by the insurance examiner, were full, complete, and true to the best of his knowledge and belief. *Id.*

Finally, the record showed that the Penn Mutual underwriter evaluated the insurance risk of plaintiff's disability based on the information plaintiff had supplied in both his application and the medical exam. *See generally* Deposition testimony of Peter Sokop, D.I. 64, 52–62; D.I. 66, 13–19. Pursuant to the underwriter's analysis, Penn Mutual issued a disability insurance policy that contained an exclusion for any impairment stemming from degenerative arthritis or rheumatism. D.I. 61 at 173. Plaintiff protested this broad exclusion, and stated he would not accept any generic wording of this type. D.I. 61 at 141. Because Penn Mutual was informed that plaintiff's arthritis history only encompassed his hips, Penn Mutual agreed to narrow the policy exclusion to "any impairment due to degenerative arthritis or rheumatism of the hip region." D.I. 61 at 39; D.I. 66 at 15.

The Court's original decision at summary judgment held that as a matter of law, the information withheld by plaintiff was material, and Penn Mutual would have excluded coverage for his cervical arthritis had plaintiff disclosed his complete medical history.

## B. Standard for reargument under Local Rule 7.1.4 [1]

◼ Although a motion for reargument is not explicitly provided for in the Federal Rules of Civil Procedure, it is not uncommon in federal practice. *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991), *aff'd mem.,* 22 F.3d 303 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995). The motion ought to be granted only sparingly, reargument is not to be granted were the matters advanced would not "reasonably have altered the result previously reached by the Court." *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.

1990). Nor should it be allowed where it would merely allow for rehashing of arguments already briefed, considered, and decided. *Id.* Finally, the procedural mechanism afforded by Local Rule 7.1.4. should not be abused to allow for a never ending polemic between the litigants and the Court. *Id.*

◼ The Court, in its discretion, may grant reargument where the Court has patently misunderstood a party or made an error not of reasoning but of apprehension. *Karr v. Castle,* 768 F.Supp. at 1090 (citation omitted). Thus, the procedural mechanism afforded by Local Rule 7.1.4 attempts to balance the interest in finality of judicial decisions with the recognition that courts sometimes err. *Kline v. Maritrans CP Inc.,* 791 F.Supp. 455, 467 (D.Del.1992) (citing *Brambles USA, Inc.,* 735 F.Supp. at 1241).

## C. Plaintiff's arguments

### 1. Concealment

In this case, plaintiff's mainstay ground for reargument is that the Court failed to consider all the relevant facts in entering judgment against him as a matter of law. His petition for reargument simply revisits his prior contentions. An examination of the evidence reveals that plaintiff, a physician, repeatedly misrepresented and obfuscated material medical facts when dealing with Penn Mutual.

Plaintiff's motion for reargument does not mention his concealment of his cervical arthritis from Penn Mutual on the insurance application; it generally attempts to trivialize both the severity of this malady and plaintiff's subsequent concealment thereof. The record shows, however, plaintiff's physician had documented plaintiff as characterizing this illness as "excruciating," requiring intensive therapy of neck traction, ultrasound, a cervical collar, Valium, and Tylenol with Codeine for a period of two months. D.I. 61 at 227. Plaintiff's motion for reargument offers no insight or supplementary information to

---

1. Local Rule 7.1.4 provides:

A motion for reargument shall be served and filed within 10 days after the filing of the Court's opinion or decision. The motion shall briefly and distinctly state the grounds therefor. Within 10 days after service of such motion, the opposing party may serve and file a brief answer to each ground asserted in the motion. The Court will determine from the motion and answer whether reargument will be granted.

justify his withholding of this information on the policy application. Plaintiff somehow expects the Court to discount or overlook this concealment.

Instead, plaintiff seizes upon an apparent clerical error made by the Penn Mutual medical examiner in her report of a history and physical performed on plaintiff as part of the application process. Although originally I deemed it unnecessary to consider this evidence in deciding that plaintiff concealed material medical information, plaintiff exhorts the Court to re-examine its grounds for decision and consider this evidence. In so doing, however, plaintiff meets himself coming; his emphasis on this evidence only highlights further deceptive behavior on his part.

During her examination of plaintiff, the Penn Mutual medical examiner was required to take a detailed oral history from plaintiff. One of the questions on the form for reporting the medical examiner's findings, number 2(h), required plaintiff to answer the question "Have you ever been treated for or had any indication for Arthritis, gout, or disorder of muscles, bones, or joints?" D.I. 61 at 53. The Penn Mutual medical examiner correctly noted plaintiff's disclosure of his recent bilateral (both sides) hip replacement. She incorrectly corresponded this notation to question number "4(g)," a question number that did not exist. *Id.*

The medical examiner also documented plaintiff as reporting "degenerative changes in lumbar spine—no symptoms." *Id.* She also incorrectly corresponded this notation to "4(g)." *Id.* Although plaintiff did have a history of lumbar (lower) back problems, he now asserts in his motion for reargument that he also "must have mentioned his cervical spine condition to the medical examiner." D.I. 73 at ¶ 8. Plaintiff relies on his deposition testimony:

Q: Do you recall telling the medical examiner on that date that you had degenerative changes in your lumbar spine with no symptoms?

A: (Plaintiff) No. I don't specifically recall ... I have talked about degenerative changes in the lumbar spine. I'm sure I must have mentioned them in the cervical spine....

D.I. 61 at 133. The Court agrees that plaintiff may have disclosed a cervical condition to the medical examiner, plaintiff vigorously disputes the omission of any reference to 'cervical spine' by the examiner. Plaintiff insists that this creates an issue of fact for the jury to decide.

An issue of fact, perhaps, but a jejune issue not rising to the level of a genuine issue of material fact necessary to overcome summary judgment. For purposes of the motion for reargument, the Court will accept, as it must, that the above deposition testimony is an accurate exposition of what plaintiff related to the medical examiner, and draw all inferences in plaintiff's favor. Even when viewed in the light most favorable to him, plaintiff only further accents his lack of candor about his cervical condition. He cannot point to where the record shows he disclosed his cervical *arthritis* to the medical examiner; he merely argues that he related a history of cervical spine *degenerative changes.* D.I. 73 at ¶ 8. Both plaintiff and defendant agree that there is significant difference between 'degenerative changes' in one's spine, which may not result in any symptomatology, and arthritis, which does, and in this case, has. D.I. 61 at 141; D.I. 66 at 16.

Finally, the Penn Mutual physical functioned as an opportunity for the insurer to assemble plaintiff's complete medical history, as evidenced by the questions on the Medical Examiner's Report form. *Id.* at 45. On the form, Penn Mutual asked specifically "have you *ever* been treated for" a laundry list of illnesses; plaintiff reported various ailments dating back to childhood. *Id.* (emphasis added). The form required plaintiff to answer the question, "Have you ever been treated for or had any indication of Arthritis, gout or disorder of muscles, bones or joints?" Plaintiff answered, yes, he had undergone hip replacement surgery, and that he had degenerative changes in his lumbar spine, with "no symptoms." Even though plaintiff related a chronology of treatments for his other illnesses, he did not reveal that he ever had a history of "excruciating" symptoms necessitating therapy as a result of his cervical arthritis. Instead, in answer to the question asked, he related his spinal condition as not

ever manifesting symptoms. Even as Court receives plaintiff's version of the facts as being true, the Court must conclude as a matter of law plaintiff materially understated his history of cervical arthritis, depicting it as something much less than what he knew it to be.

In the same vein, plaintiff also challenges the Court's analysis with respect to the Penn Mutual underwriter. The Court held that had the underwriter been informed of plaintiff's cervical arthritis history, he would have definitely placed an exclusion into the policy precluding disability coverage for future episodes of cervical arthritis. This was grounded primarily on the underwriter's conduct and recommendations during the embryonic stages of the insurance policy, *i.e.*, well before any claim or litigation was initiated by plaintiff.

The underwriter, Peter Sokop, testified at deposition that he relied on the documentation supplied to him in plaintiff's handwritten application and the report of the medical examiner. In plaintiff's motion for reargument, plaintiff points out that Sokop viewed the information "degenerative changes in the lumbar spine—no symptoms" as "incidental findings," not warranting any policy exclusion for that condition. Plaintiff also stresses that Sokop also testified that had the medical examiner listed on the report "degenerative changes—*cervical* spine—no symptoms," he would have likewise made no changes to the policy. The Court does not quarrel with any of these particulars.

Plaintiff's motion then argues with great fervor that "there is a question of fact about whether Sokop would have accepted without exclusion plaintiff's *asymptomatic* cervical condition and issued the policy as he did." D.I. 73 at ¶ 4 (emphasis added). However, plaintiff again misstates the facts; his cervical "condition" had manifested symptoms, with prolonged and excruciating results. When underwriting plaintiff's disability policy, Sokop was supplied with the insurance application and the report of the medical examiner, both deficient in information regarding plaintiff's cervical arthritis. According to those documents, plaintiff had either no history of cervical problems, or, to be

most generous, a history of symptomless cervical "degenerative changes." Where plaintiff did relate a history of arthritis, *i.e.*, in his hip, the underwriter insisted upon writing an exclusion for that condition, even though plaintiff was currently symptom free as a result of prosthetic hip surgery. The record supports only one parallel conclusion in this case: had plaintiff apprised Penn Mutual of his diagnosis of cervical *arthritis*, with or without his history of symptomatology, or current symptoms, the insurer would have written an exclusion for it as well.

### 2. Materiality

■ Plaintiff also disputes that any misrepresentation or concealment on his part was material under Delaware law. He correctly cites *Prudential v. Gutowski*, 49 Del. 233, 113 A.2d 579 (Del.1955), for its dictum that materiality of minor or temporary ailments is an issue of fact for the jury to decide. The *Prudential* court found that "misrepresentations of this character are either treated as immaterial or as issues to be left to the jury. But this case is not one of them." *Id.* 113 A.2d at 580. Neither is the case *sub judice*. It is hornbook law that where the insurer seeks a specific answer, the fact elicited will usually be treated as a material one. 12A Appleman at § 7295 (citations omitted); *see also New Castle County v. Hartford Accident and Indem. Co.*, 685 F.Supp. 1321, 1327 (D.Del.1988) (citing *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928)). Here, there is ample evidence that Penn Mutual regarded arthritis as a disease material to the risk of insurability.

First, the Penn Mutual Medical Examiner's Report form deliberately referenced arthritis, designating it of material weight warranting specific questioning. D.I. 61 at 29. Second, it is self evident that Penn Mutual regarded plaintiff's hip arthritis as material, even though it was asymptomatic, when the insurer excluded any illnesses relating to the hip arthritis from disability coverage. Penn Mutual's consideration of arthritis as material is even more manifest when one views Penn Mutual's conduct during negotiation of the policy exclusion for arthritis. Plaintiff

challenged the initial exclusionary provision barring disability coverage for any conditions stemming from arthritis, and would not accept this exclusion as written. As a result, Penn Mutual had a second chance to evaluate the insurability risk of arthritis in this case. Even though it acquiesced on the breadth of the exclusion, Penn Mutual insisted on retaining the hip-related arthritis exclusion in light of the positive history of arthritis, an affirmative ratification of its materiality. With full knowledge that his arthritis condition encompassed more than just his hips, plaintiff approved of the limited exclusion. Yet, he incongruously argues that he acted with the requisite "utmost fairness" required of him under Delaware law. The Court is not persuaded.

Finally, plaintiff misreads the statute controlling the voiding of insurance policies in Delaware, 18 *Del.C.* § 2711. The Court based summary judgment on two provisions in the statute: subsection (2), plaintiff's misrepresentations were material, and subsection (3), had it been fully informed of plaintiff's medical history, Penn Mutual would have written an exclusion for plaintiff's cervical arthritis. The statute is explicitly written in the disjunctive and allows for alternative foundations for granting summary judgment in this case. Even if there was a genuine issue of materiality in this case, the Court's analysis under subsection (3) of the statute, as discussed *supra*, would support a decision as a matter of law in favor of Penn Mutual.

### 3. Prior disclosures to Penn Mutual

Plaintiff's penultimate argument raises an issue of whether there was prior disclosure of his cervical arthritis to Penn Mutual. In his motion, he declares he "believed that he did mention his history of cervical and lumbar spine problems to ... Mr. Lee, Penn Mutual's agent." D.I. 73 at ¶ 6. With that said, however, he did not direct the Court to where it could be found in the record. The record does show plaintiff as testifying that he could not identify any specific member of

the Penn Mutual organization to whom he made disclosure concerning his cervical spine problem, including his insurance agent. D.I. 61 at 147–149. The Penn Mutual agent, William Lee, corroborated this in his deposition, where he testified that neither his records nor his recollection reflected any such conversation with the plaintiff. D.I. 61 at 57–68, 76–77; D.I. 66 at 11–12.

■ Finally, plaintiff relies on a prior application for life insurance submitted to Penn Mutual in 1982. D.I. 64 at 9. During a medical exam for his Penn Mutual life insurance, the medical examiner noted that plaintiff reported "arthritis of the hip and spine." *Id.* Plaintiff, in effect, argues that this disclosure obviated his duty under 18 *Del.C.* § 2711 and applicable case law to make full and fair disclosure to Penn Mutual when applying for his disability insurance.

■ This argument, too, must fail. It is a fundamental proposition in insurance law, consistent with Delaware law, that the insurer may rightfully rely upon statements in the application without checking all of its files to determine whether the insured is concealing or misrepresenting facts. *See* 16B Appleman § 9086; Mark S. Rhodes, *Couch on Insurance* 2d § 35.133 (1983). Delaware courts have even taken this majority rule a step further, holding that even if an insurer should have researched the veracity of an applicant's representations, it has not waived the right to later assert and prevail on a claim for misrepresentation. *Pacific Ins. Co. v. Higgins,* 1994 WL 114898 (Del.Ch. March 23, 1994), *aff'd mem. Epps v. Pacific Ins. Co.,* 648 A.2d 424 (Del.1994);[2] *New Castle County v. Hartford Accident & Indem. Co.,* 685 F.Supp. 1321, 1328–29 (D.Del.1988). There is no evidence that Penn Mutual exhibited the type of intentional and knowledgeable relinquishment of a known right as Delaware law requires for a waiver. *See Arnold v. Society for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1289 (Del.1994); *Pacific Ins. Co. v. Higgins,* 1994 WL 114898 at *8; *New Castle*

---

**2.** In its affirmance of the lower court opinion, the Supreme Court of Delaware concluded that the "well-reasoned opinion of the Court of Chancery correctly applied well-established principles of law." 648 A.2d 424, 1994 WL 276977 (Del.

June 10, 1994). Unpublished orders of the Delaware Supreme Court have precedential effect in Delaware. *See* Del.Sup.Ct.R. 17(a) Commentary; *New Castle County v. Goodman,* 461 A.2d 1012, 1013 (Del.1983).

*County v. Hartford Accident,* 685 F.Supp. at 1329. Accordingly, Penn Mutual was within its rights to pursue rescission as an appropriate remedy in this case.

## CONCLUSION

Plaintiff's motion for reargument amounts to nothing more than a disagreement with this Court's considered application of Delaware law to the record. His motion does not advance overlooked facts or legal theories that compel alteration of the Court's prior decision of December 23, 1994. The Court reiterates its reasoning and holding of that date, and augments it with this opinion. Accordingly, plaintiff's motion for reargument will be denied.