**Steven M KRAFT, Plaintiff,**

v.

**MASSACHUSETTS CASUALTY INSURANCE COMPANY, Defendant.**

**No. 1:02–CV–00143–MP–AK.**

United States District Court, N.D. Florida. Gainesville Division.

May 10, 2004.

Jack M. Ross, Jack M. Ross PA, James Haddon Sullivan, III, Gainesville, FL, for Plaintiff.

John E. Meagher, Jonathan Matthew Fordin, Sandra Maria Upegui, Shutts & Bowen LLP, Miami, FL, for Defendant.

### ORDER

PAUL, Senior District Judge.

This matter is before the Court on motions for summary judgment filed by both sides. Having reviewed the pleadings, the Court determines that summary judgment is appropriate and that summary judgment is hereby granted in favor of the plaintiff on the issue of whether Dr. Kraft is and was totally disabled under the terms of the policy.

Plaintiff, Dr. Steven M. Kraft ("Kraft"), is a cardiologist who practices in the specialty of invasive and interventional cardiology. He was insured under two individual disability policies issued by Defendant, Massachusetts Casualty Insurance Co. ("MassCasualty"). (Policy No. 0445293, "the 89 policy", Ex. 105; Policy No. 0239797, "the 81 policy", Ex. 106). The policies defined different benefits for total versus residual disability. The definitions of "total disability" and "residual disability" are almost identical in the two policies:

> The term "total disability" means complete inability of the Insured to engage in his regular occupation or profession.
>
> \*    \*    \*    \*    \*    \*
>
> The term "Residual Disability" means the ability of the Insured to perform some but not all of the important duties of his regular occupation or profession.

The above language defines "total" or "residual" disability with regard to the insured's "regular occupation or profession." As discussed more fully below, determining Dr. Kraft's regular occupation or profession is the central issue in this case. Dr. Kraft insists that his "regular occupation or profession" should be considered his specialty, "invasive and interventional cardiology" rather than merely his general field of cardiology. The reason this distinction matters is that the evidence in this case is uncontroverted that Dr. Kraft can perform "some but not all of the important duties of" a cardiologist, but that he can perform none of the important duties of an "invasive and interventional cardiologist."

To support the claim that his regular occupation or profession is his specialty, Dr. Kraft points to a series of events culminating in MassCasualty sending Dr. Kraft what the MassCasualty agent that dealt with Dr. Kraft calls a "specialty letter." Shortly after issuing the "89" policy, Massachusetts Casualty sent an initial "specialty letter" to Kraft defining his "regular occupation or profession" as that of a "Cardiologist." (Ex. 48). Kraft immediately sought a correction of this language (Ex. 49), and MassCasualty, by its Chief Underwriting Officer, sent Kraft a second specialty letter which recognized Kraft's specialty as an "Invasive and Interventional Cardiologist." (Woodruff Affidavit, Ex. 21; Kraft Deposition, p. 204, 11.11–21). The specialty letter contained the following specific and promissory language:

> Policy No. 0445293
>
> Steven M. Kraft, Md
>
> Dear Doctor Kraft:
>
> We welcome you as a Policyowner of this Company and take this opportunity to explain the term "your regular occupation or profession" as used in your policy.

Briefly, your Policy pays a basic monthly benefit for a scheduled period when, due to injury or sickness, you are substantially unable to perform the material duties of the regular occupation or profession in which you are engaged at the time of any disability.

We understand your present occupational specialty to be that of an Invasive and Interventional Cardiologist. You, of course, may change your occupation or speciality at any time without an increase in premium.

If you continue in your present specialty, this would constitute your regular occupation or profession. Any policy benefits payable for total disability would be based on your inability to perform the duties of such specialty and in accordance with the remaining provisions of your policy. The fact that you could engage in some speciality or occupation would not disqualify you from receiving benefits.

From 1989 until August 1, 2001, Kraft continued to work in his specialty at Interventional Cardiologists of Gainesville, P.A. ("IVC") where Kraft was an owner and partner, as an invasive and interventional cardiologist. (Affidavit of Steven M. Kraft; Affidavit of Gregory A. Imperi; Affidavit of Howard W. Ramsey). In January, 2001, however, Kraft underwent a lumbar discectomy for partial relief of degenerative disc disease which was causing back pain radiating into his legs. (Kraft Deposition, pp. 81, 85). After a short convalescence Kraft attempted to resume working as an invasive and interventional cardiologist. (Kraft Deposition, p. 87).

However, Kraft struggled with the invasive procedures which constituted his specialty, The duties of his professional speciality required Kraft to wear a weighty protective apron, to stand for periods of time, to rotate his body, and to bend over for extended periods. (Kraft Deposition,

pp. 125–27). These activities exacerbated Dr. Kraft's degenerative disc disease and caused continuing pain in, and deterioration of, his spine. As a result, Kraft found himself physically unable to continue his specialty, and Kraft ceased working as an interventional cardiologist as of July 13th, 2001.

Kraft considered continuing to perform a smaller number of invasive procedures. However, both Kraft and his fellow physicians recognized this would result in a lessening of Kraft's proficiency and create an inappropriate risk to his patients. (Affidavit of Gregory A. Imperi). His "partners" in IVC agreed that Kraft would continue to be employed by IVC, but would not perform further invasive procedures. Dr. Kraft continues to work as a cardiologist but he no longer can perform, nor does he actually perform, the invasive or interventional procedures. (Ex. 2).

Specifically, the evidence is uncontroverted that after his disability he could perform around 40% of the duties he did prior to his disability. That is, Dr. Kraft stated in his Occupational Duties Form that his occupational duties immediately before his disability consisted of:

| | | |
|---|---|---|
| a) | Diagnostic Catheterization | 25% |
| b) | Coronary Interventions | 25% |
| c) | Pacemaker Implantation | 10% |
| d) | Noninvasive diagnostics | 20% |
| e) | Patient Workups | 20% |

But after his disability, Dr. Kraft testified in his deposition that he continues to perform duties (d) and (e) above, noninvasive diagnostics and patient workups, which constituted 40% of the duties he previously performed. He could not perform any of the above duties that would be characterized as "invasive and interventional." Thus, it is uncontroverted that Dr. Kraft could perform "some but not all of the important duties" of a general cardiologist, but none of the important duties of an "invasive and interventional cardiologist."

In August of 2001 Dr. Kraft submitted a claim for insurance benefits to Massachusetts Casualty. (Ex. 3). On the 10th of September, 2002, Massachusetts Casualty denied Dr. Kraft's claim for total disability benefits and suggested instead that Dr. Kraft qualified only for residual disability benefits because Kraft is still working as a cardiologist, albeit without performing any invasive or interventional procedures. (Ex. 12).

Every doctor who has examined Kraft has concluded that he is disabled as an invasive and interventional cardiologist. His treating neurosurgeon, Dr. John Stevenson, clearly directed that he not perform procedures in the cath lab. (Ex. 126, p. 2). MassCasualty's selected physician, Dr. Troy Lowell concluded, "Dr. Kraft can be considered disabled as an interventional cardiologist." (Ex. 149). Dr. Lowell's explanation of his conclusion was as follows:

Q. What do you mean when you say he is disabled as an interventional Cardiologist?

A. That he's medically unable to perform those duties without severe impairment.

(Deposition of Troy Lowell, p. 11, 15–18).

As posited above, this case comes down to whether the insurance contract between the parties intended the amount of disability to be measured against a regular occupation as a general cardiologist or the more specialized duties as an invasive and interventional cardiologist. Specifically, the plaintiff relies upon the specialty letter and argues that the parties agreed that his "regular occupation" would be invasive and interventional cardiologist. The defendant argues that the letter is not part of the contract and is therefore should be considered as parol evidence. Furthermore, the defendant argues, the contract terms are not ambiguous and thus parol evidence cannot be considered in this case. The defendant then proceeds to describe a series of cases which involve various species of parol evidence and hold that the evidence should not be considered. However, none of the cases addressed a bargained-for, written modification, signed by the Chief Underwriter of the insurance company.

In reality, the instant case is closest to *Rosenberg v. Guardian Life Ins. Co.*, 510 So.2d 610 (Fla.App. 3 Dist.,1987). In that case, the Court found that the speciality letter was not merely parol evidence, but was a "bargained-for modification." Thus, it was part of the contract, and not merely extrinsic matter intended to explain it. The following excerpt is equally fitting to the instant case:

Stanley Rosenberg, an ophthalmologist, filed an action seeking to have declared his right to receive total disability benefits from his insurer, Guardian Life Insurance Company, for a period during which Rosenberg, although indisputably able to engage in a substantial part of the practice of his specialty (and successfully so doing), was indisputably unable to perform microsurgery. The trial court found in essence that because Rosenberg was able to perform the substantial part of his regular duties and because eye surgery was merely a nominal part of Rosenberg's practice before the onset of his disability, he was not entitled to these benefits. Rosenberg appeals.

Were this simply a matter of determining whether Rosenberg was totally disabled within the meaning of that term in the insurance policy, we would have little difficulty in agreeing with the trial court that, under the cases giving meaning to that term, *see, e.g., New England Mutual Life Insurance Co. v. Huckins*, 127 Fla. 540, 550, 173 So. 696, 700 (1937) ("the incapacity contemplated means incapacity or inability to the ex-

tent of being wholly and permanently unable to do substantially all of the material acts that are usually required to be performed in the occupation or profession or work in which the insured is engaged"); *Sun Life Insurance Company of America v. Evans,* 340 So.2d 957 (Fla. 3d DCA 1976); *Lorber v. Aetna Life Insurance Co.,* 207 So.2d 305 (Fla. 3d DCA 1968); *Scott v. General Accident Fire & Life Assurance Corp.,* 158 So.2d 532 (Fla. 3d DCA 1963), Rosenberg was not totally disabled and not entitled to commensurate benefits. However, it is clear that in 1982, well before the onset of any disability, Guardian, through its agent, modified the existing policy when it assured Rosenberg in a letter that he would be entitled to disability benefits even though he was "able to engage in a general or specialized medical practice which did not include the essential activities associated with a specialist in ophthalmic surgery." Under this bargained-for modification, [FN2] Rosenberg was entitled to benefits notwithstanding that only a small part of his practice had theretofore been devoted to ophthalmic surgery and notwithstanding that his practice flourished upon his return from the disabling illness.

> FN2. Guardian's letter was in response to one written by the field representative who had sold the policy to Rosenberg asking for assurance that "Dr. Rosenberg is, in fact, covered by The Guardian in his new speciality, ophthalmic surgeon, and if he is prevented from performing ophthalmic surgery, the Guardian will pay him disability income of $3,200 monthly benefits."

*Rosenberg v. Guardian Life Ins. Co.,* 510 So.2d 610 (Fla.App. 3 Dist.,1987).

In the instant case, the only evidence concerning the specialty letter is the plaintiff's testimony and the testimony of Bruce Woodruff, the appointed agent for the defendant in the state of Florida. This testimony and evidence has not been controverted by the defendant. Mr. Woodruff described in his affidavit (1) how he had been trained by the defendant to offer the specialty letter to professionals like Dr. Kraft to counter the use of such letters by competitors; (2) how after receiving a letter with the specialty "Cardiologist," plaintiff specifically required the insurance company to modify the specialty letter to specify "Invasive and Interventional Cardiologist"; and (3) how the company's chief of underwriting signed and returned an amended letter agreeing that the regular occupation or profession was "Invasive and Interventional Cardiologist,". The letter in question is set out fully above. It is clear that the specialty letter is not mere parol evidence which might help to explain the meaning of some term of the insurance contract. Rather, it is a full-blown, bargained-for modification of the contract, just as a similar type of letter was held to be in *Rosenberg, supra.*

The defendant's attempt to distinguish *Rosenberg* is without merit. Defendant lists a series of cases in which there was no bargained-for modification, such as the specialty letter present in this case, but in which there were provisions defining "residual" liability. In each of defendant's cases, the Court relied upon the residual clause to find that the insured could still perform some but not all important duties and thus was not totally disabled. Since the *Rosenberg* case did not discuss the existence of a residual clause, and there is a residual clause in the instant case, the defendant argues that the *Rosenberg* case should be distinguished.

The defendant misses the point, however. The salient difference between the cases cited by defendant and *Rosenberg* is

the existence of the bargained-for modification, which made it clear what the meaning of "residual" versus "total" liability was. In the defendant's cases, the Courts had no such modification to rely upon. Therefore, it is defendant's cases which are inapposite.

A case which better applies to our fact pattern is *Oglesby v. Penn Mut. Life Ins. Co.*, 877 F.Supp. 872, 881 (D.Del., 1994). In *Oglesby*, the Court addressed a fact pattern virtually indistinguishable from the instant case. The question was whether the doctor was a general radiologist or an "interventional and vascular" radiologist. The Court found in favor of the doctor on several issues we now face. First with regard to the term "regular occupation," the Court stated:

> The Court finds that the policy terms defining "regular occupation" are clear on their face and subject to only one reasonable interpretation. In the plain meaning of the insurance policy's explicit terms, regular occupation is explained as one's usual work when total disability starts; an insured is totally disabled when he or she cannot do the substantial and material duties of that usual work. Therefore, if Oglesby's usual work was that of an interventional and vascular radiologist, and not a general radiologist, and he no longer could perform the substantial and material duties of that usual work, he would be entitled to Penn Mutual disability insurance benefits.

Id. at 881 (D.Del.,1994). Then, the Court examined the impact of the "specialty letter" if the Court were to hold that it was parol evidence but that the contract itself was ambiguous. The result would be the same, the Court found, stating:

> An agreed interpretation of the clause at issue by the parties, especially before the controversy arises, is an important aid in the interpretation of alleged uncertain terms. *Pacific Indem. Co. v.*
> *Interstate Fire and Cas. Co.*, 302 Md. 383, 488 A.2d 486, 489 (1985); *Celley v. Mutual Benefit Health and Accident Assn.*, 229 Pa.Super. 475, 324 A.2d 430, 435 (1974). A prior construction given by the insurance company itself "must be considered as very persuasive." *Meier v. New Jersey Life Ins. Co.*, 195 N.J.Super. 478, 480 A.2d 919, 923 n. 3 (1984), aff'd, 101 N.J. 597, 503 A.2d 862 (1986). Thus, Penn Mutual's interpretation of "regular occupation" as interventional and vascular radiology in its May 5, 1987 letter must be accorded great weight. This letter resolves any putative ambiguity in favor of the plaintiff; any contrary argument arising after a claim has been filed against the company is disingenuous.

*Id.* at 882.

Thus, as *Oglesby* points out, under either way of looking at the "specialty letter," the result is the same: the insured and insurer agreed that Dr. Kraft's "regular occupation or profession" at the time of disability was "invasive and interventional cardiologist" and not merely cardiologist. Accordingly, the later interpretation of this term by defendant's benefits administrator was simply wrong.

In fact, the Court agrees with the *Oglesby* court that this "contrary argument arising after a claim has been filed against the company is disingenuous" at best. Thus, even if the Court were to find that this is an ERISA case, the plaintiff would prevail. That is, the decision of the benefits administrator—finding that the specialty letter with its highly specific terms and promissory language was not a part of the bargained-for agreement and that Dr. Kraft had therefore not bargained for coverage as an invasive and interventional cardiologist—is arbitrary and capricious based on the record before the administrator at the time of the decision. *See Brown v. Blue*

*Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990).

In light of that conclusion, and because jurisdiction of this Court is separately premised upon diversity jurisdiction, the Court awards summary judgment in favor of the plaintiff but declines to reach the question of ERISA coverage unless the parties indicate that it is necessary to resolve any remaining issues in the case, such as damages or attorney fees.

Accordingly, for the above reasons, it is hereby

**ORDERED AND ADJUDGED:**

1. The joint motion to extend time to answer the motions for summary judgment (doc. 83) is granted, nunc pro tunc, and the motion to file a response in excess of the page limits (doc. 86) is granted.

2. The plaintiff's motion for summary judgment (doc. 71) is granted, and the Defendant's motions for summary judgment (docs. 68 and 69) are denied.

3. The discovery motions and related scheduling motions currently pending in this case (docs. 37, 43, 47, 48, 49, 56, 62, 66) do not appear relevant to the issues upon which summary judgment is based; thus, summary judgment is appropriate despite their pendency. They are denied as moot.

4. The Clerk is directed to set this matter for a telephone status conference in the next few weeks.